**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Salvatore Di MUCCI, Robert Di Mucci
and Anthony Di Mucci,
Defendants–Appellants.**

**No. 87–2692.**

United States Court of Appeals,
Seventh Circuit.

Argued May 27, 1988.
Decided July 13, 1989.

Gerard C. Smetana, Abramson & Fox, Chicago, Ill., for defendants-appellants.

Miriam R. Eisenstein, Asst. U.S. Atty., U.S. Dept. of Justice, Washington, D.C., Anton R. Valukas, U.S. Atty., Chicago, Ill., Margaret Gordon, Jessica Dunsay Silver, Dennis J. Dimsey, Asst. U.S. Attys., U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before POSNER, MANION, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Appellants in this case, the Di Mucci brothers, appeal the district court's entry of a default judgment against them in this case, the district court's refusal to set that judgment aside, and the district court's order ordering affirmative injunctive relief. For the reasons discussed below, we affirm.

## I. Background

On October 4, 1984, the United States filed its complaint in federal district court against the three Di Mucci brothers: Salvatore, Robert and Anthony. The Di Muccis own four apartment buildings in the suburbs of Chicago: the Cottonwood, Alpine and Mt. Shire complexes in Mount Prospect, Illinois, and the English Valley complex in Palatine, Illinois. The United States' complaint charged the defendants with being engaged in a "pattern or practice" of making apartments unavailable to persons because of their race in violation of the Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq.*

On January 17, 1985, the United States served its first Rules 33 and 34 interrogatories and document requests. These requests and interrogatories sought the names and addresses of the buildings defendants owned, information about their managers, occupants and potential occupants, and information about how the apartments were managed. Defendants did not respond until March, 1985, when they produced some documents but answered none of the interrogatories. On five occasions, the district court ordered the defendants to respond to all outstanding discovery requests: March 26, April 10, May 2, June 5 and June 20, 1985.[1] At no time did defendants fully comply with these orders. In the fall of 1985, defendants asked for, and the United States agreed to, three postponements of defendants' depositions. The government only agreed to the last postponement in exchange for defendants' agreement to produce certain subpoenaed materials and all outstanding discovery by September 27, 1985. When the outstanding discovery was not produced, the government moved on October 9, 1985, to have defendants held in civil contempt. On October 16, 1985, the defendants did not appear for their depositions. Counsel for defendants was reached by telephone. He claimed that he assumed no depositions would be held because the documents sought prior to them had not been produced.[2]

On the same day, the government went to the district court with an emergency motion to compel defendants' attendance at the deposition. At that time, the district court struck defendants' pleadings and entered a default pursuant to Rules 37 and 55(a) of the Federal Rules of Civil Procedure. The court also invited the United States to move for entry of a default judgment. On October 25, 1985, the government moved for entry of such a judgment pursuant to Rule 55(b)(2). Defendants moved on November 1, 1985, to have the default set aside pursuant to Rule 55(c).[3] Defendants subsequently changed attor-

---

1. The district court apparently treated counsel's representation in open court on May 2, 1985, as the functional equivalent of an order to produce.

2. At oral argument, counsel for the appellants (a different attorney) characterized this as their former attorney's having "cancelled" these depo-

sitions. We agree with the appellee that this conduct hardly amounts to a "cancellation."

3. Entry of a default under Rule 55(a) is not, as such, entry of a judgment of default; it merely permits the plaintiff to move for such a judgment under Rule 55(b)(2), assuming that the default is not set aside under Rule 55(c).

neys and moved to stay decision on the proposed default judgment. The district court granted a stay to December 5, 1985, but the judgment was not in fact entered for another four months.

During this time, the Di Muccis' former attorney, John L. Gubbins, filed a lengthy response and affidavit at the court's invitation. In this affidavit, he maintained that he had been instructed to deal solely with Salvatore Di Mucci, that he had done so diligently, that Salvatore had but "grudgingly" given him the information and documents for the government that he *did* turn over, and that Mr. Di Mucci categorically refused to provide any information which would lead to identifying his former employees. Gubbins also claimed that he had warned him repeatedly that the court was likely to hold the defendants in default.

Salvatore Di Mucci's responding affidavit presented a different version of the facts. He claims that he met and spoke with Gubbins only infrequently. Di Mucci claims that he had not been kept informed of the progress of the case, that he had not been made aware of the contempt or default proceeding, and that he had not been told that the court had warned that it would impose sanctions for the defendants' failure to produce discovery. This affidavit, however, did not deny knowledge of the discovery requests, and did not claim to have fully complied with them. Rather, it stated that it had been Salvatore Di Mucci's opinion that Gubbins should have taken a "vigorous defensive position" to the discovery requests of the government, which he felt were too broad and addressed to the wrong parties. Di Mucci also claims not to have received any written communications regarding motions for contempt or default or to compel. Defendants did not request a hearing on the opposing affidavits, although they claimed at oral argument that they were entitled to one.

At a status hearing on January 9, 1986, defendants tendered a large box of W-4 forms, going back many years, that did not identify which of the employees named on the forms were rental agents. The government rejected this "proffer" as essentially too little too late.

On April 3, 1986, the district court granted the United States' motion for entry of default judgment, and asked the government to submit a proposed order together with an affidavit in support of relief. The district judge's accompanying memorandum opinion noted two independent, viable legal bases for entry of default pursuant to Rule 55(a): defendants' disobedience of five successive court orders to produce answers and documents in response to discovery requests, and defendants' failure to appear for their depositions. The district court also held that there was no justification for setting aside the default, because defendants had not shown good cause for their actions.

On April 10, 1986, the United States submitted a proposed order to the court. This order enjoined the defendants from further violations of the Fair Housing Act. In addition, it required the defendants to take certain affirmative steps to ensure future fair and open housing.

Defendants moved the district court on April 14, 1986 to reconsider its April 3 order and filed an opposition to the government's proposed order. On April 29, 1986, the district court entered an opinion denying reconsideration. It also decided to enter the proposed decree, but treated defendants' opposition to it as a motion under Rule 59(e) of the Federal Rules of Civil Procedure to amend or alter judgment. The court referred the matter to a magistrate to consider whether the affirmative provisions of the order were appropriate. On July 17, 1986, the magistrate issued a report recommending that the original decree, with minor modifications, be entered. The district court entered an amended decree on September 10, 1986 but again stayed the affirmative parts of the order on defendants' motion. On October 9, 1986, the court vacated the affirmative parts of the injunction and referred the matter to the magistrate a second time, ordering that an evidentiary hearing be held as to the propriety of affirmative relief.

This evidentiary hearing was held in November and December of 1986. As appellants admitted at oral argument, this "hearing" essentially was a trial of the case "through the back door." At the evidentiary hearing, the magistrate heard the testimony of Robert Di Mucci and of three property managers. The government offered the testimony of Tina Meadows, a former rental agent employed by the Di Muccis for a few months in 1983. She testified that she was instructed by two of the property managers not to give the normal telephone sales pitch if she suspected the caller was black or a member of another minority group and to give less than the normal sales pitch (or none at all) when showing a model apartment to a black person.[4]

The United States also presented testimony regarding six incidents in which black apartment seekers or testers acting on behalf of the Leadership Council for Metropolitan Open Communities ("Leadership Council") were treated discriminatorily.[5] Two of these incidents involved refusals to rent to bona fide apartment seekers.[6] In other cases, defendants' agents told black testers that apartments of the size they wanted were unavailable while telling white testers that such apartments were in fact available.[7] In two of these cases, defendants' agents treated black testers differently from the way they treated white testers, making greater efforts to rent apartments to the white testers.[8] The government also presented testimony from

---

**4.** Defendants introduced testimony contradicting Meadows' testimony. Marlene Cortesi testified that Meadows was an unprofessional employee with personal problems, that she was fired, and that she swore revenge. Both Cortesi and Mary Bouris, another property manager, denied giving the discriminatory instructions.

**5.** Testers are "individuals who, without an intent to rent ... [an] apartment, pose as renters ... for the purpose of collecting evidence...." See Havens Realty Corp. v. Coleman, 455 U.S. 363, 373, 102 S.Ct. 1114, 1121, 71 L.Ed.2d 214 (1982).

**6.** In the first of these incidents, the so-called "Hicks incident," Sherman Hicks, a black apartment seeker, was told that no two-bedroom apartments were available for mid-September or early October of 1982. A white tester, however, was told that apartments in two Di Mucci-owned complexes would be available for that time. The Hicks incident is the subject of a separate lawsuit.

The second incident of refusal to rent to a black bona fide apartment seeker involved Tina Lewis, a black woman who wanted to sublet an apartment in a Di Mucci complex. She went to the office of the Mt. Shire apartments to fill out an application, and returned the following day to sign it and leave money for a credit check. Later, she learned that the apartment had been rented to someone else. The Di Muccis argued that this is because Lewis' proposed roommate also did not fill out an application, an explanation the magistrate evidently discredited.

**7.** In one incident, white tester Janis McGowan was told by a rental agent that more than one two-bedroom apartments would be available in the English Valley complex for June 1, 1983. Grace Terry, a black tester, was told that she would be called if a two-bedroom apartment

became available for then, but she never was. She also claims that she was not shown an actual apartment, but rather was shown the rental office and asked to imagine it with an additional bedroom and bath. The rental agent also is reported to have said to McGowan as they passed by Terry and her companion, "Gee, I am glad we missed those." In another incident at the Mt. Shire apartments, Susan Swanson, a white tester, was told a two-bedroom apartment would be available immediately, while Diane Outram, a black tester, was told that one would not be available until November 1, 1983.

**8.** As part of the Hicks test, Shirley Lambert, a black tester, went to the Alpine complex on September 8, 1982. The rental agent told her that the Cottonwood complex was far away (although in actuality it was within easy walking distance). When Lambert arrived there after getting lost en route, the rental agent left her there to look at the model apartment unaccompanied, and did not come back for half an hour. When Lambert returned two days later with her "fiance," a different agent walked them to the apartment, but did not give them much of a sales pitch. The agent said that both of them would have to fill out applications and submit to a credit check, as well as giving one month's rent as a deposit.

On another occasion, Alfrieda Williams, a black tester, was told that a one-bedroom apartment would be available on the desired date. Unlike a white tester who came on the same day, however, Williams was not shown a model apartment.

There also was testimony to the effect that black testers were told that they needed to put down one month's rent at the time of application while white testers were told that they could hold an apartment with a small deposit.

Kale Williams, the Leadership Council Executive Director, on the need for affirmative relief in cases such as this.

On March 10, 1987, the magistrate issued a report containing findings of fact and conclusions of law. She concluded that although in the case of a default, the facts alleged are taken as true, the government still had to show that the violations amounted to a "pattern or practice" of discrimination, and that there was a likelihood that the violations would recur. In her report, she found that "defendants intentionally discriminated against black persons in the rental of apartments," and that the incidents of race discrimination were not simply isolated incidents but "formed a pattern and practice of discrimination carried out by defendants and their agents." The magistrate also concluded that both prohibitory and affirmative remedies were necessary.

On October 7, 1987, the district court adopted the magistrate's report and recommendations and reentered the injunction vacated earlier. In summary, the affirmative relief ordered by the court was as follows: (1) that defendants' employees sign statements that they understood the order and would comply with it, and that they understood that failure to comply could lead to court action against them; (2) that defendants engage in extensive instruction of present and future employees and agents in the requirements of the law and of the order itself; (3) that defendants make the public in general, and the minority population in particular, aware of the fair housing policy they would be following; (4) that defendants implement uniform and objective nonracial standards for rental of all apartments; and (5) that defendants maintain certain records and report certain data to the United States for three years. Defendants appeal.

## II. Discussion

### A. *Default Judgment Against Defendants* [9]

#### 1. Entry of Default/Default Judgment

Defendants argue that the district court abused its discretion in entering a default against them. Their primary argument is that it has been the practice in this circuit not to enter a default unless lesser sanctions have proven unavailing. We find this argument to be without merit.

It is true that this circuit has said: "[D]istrict court judges are well aware that defaults should be entered only when absolutely necessary, such as where less drastic sanctions have proven unavailing." *C.K.S. Eng'rs, Inc. v. White Mountain Gypsum Co.*, 726 F.2d 1202, 1206 (7th Cir.1984) (quoting *Inryco, Inc. v. Metropolitan Eng'g Co.*, 708 F.2d 1225, 1230 (7th Cir.), *cert. denied*, 464 U.S. 937, 104 S.Ct. 347, 78 L.Ed.2d 313 (1983)); *see also Webber v. Eye Corp.*, 721 F.2d 1067, 1069 (7th Cir.1983) ("A dismissal with prejudice is a harsh sanction which should usually be employed only in extreme situations, when there is a clear record of delay or contumacious conduct, or when other less drastic sanctions have proven unavailing"). We have, however, declined to adopt a rule that the imposition of less drastic sanctions is an absolute prerequisite to the entry of a default judgment. *Hal Commodity Cycles Mgmt. Co. v. Kirsh*, 825 F.2d 1136, 1138–39 (7th Cir.1987). In that case, we said:

> While the entry of a default judgment should be used sparingly, we see no need to impose a requirement that prevents a district court from imposing that sanction if, under the circumstances, it is warranted. The Federal Rules of Civil Procedure, as well as local rules of court, give ample notice to litigants of how to properly conduct themselves. A district court is not required to fire a warning shot; as this court stated in *C.K.S. Engi-*

---

**9.** Because defendants' first motion to set aside the default was made before entry of the default judgment against them, it. is a motion under Rule 55(c). Defendants' motion to reconsider, filed after the entry of default judgment, but before the entry of final judgment, probably was treated by the district court as a motion under Rule 60(b). *See Chrysler Credit Corp. v. Macino*, 710 F.2d 363, 364 n. 1 (7th Cir.1983). In any event, because the standards for setting aside an entry of default and for vacating a default judgment are essentially the same, we can consider these motions in tandem. *Id.* at 367.

*neers,* the "district court must have the default judgment readily available within its arsenal of sanctions 'in order to ensure that litigants who are vigorously pursuing their cases are not hindered by those who are not.'" *Id.* at 1139 (citations omitted). In other words, "[a] trial court is entitled to say, under proper circumstances, that enough is enough." *In re Pyramid Energy, Ltd. v. Heyl & Patterson, Inc.,* 869 F.2d 1058, 1062 (7th Cir.1989) (citations omitted).

We do not think that the district court abused its discretion in this case by entering a default against defendants. As previously noted by the district court, there are two independent bases in this case for the entry of default: the failure of the Di Muccis to obey discovery orders, and their failure to appear for properly noticed depositions. Defendants do not deny that these are proper bases for the entry of a default under Rules 37 and 55. They merely argue that they did in fact comply with discovery. The district court, however, found to the contrary, and defendants have not convinced us that this finding was clearly erroneous. *Anderson v. City of Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985).

As we have noted in other cases, the party who seeks to demonstrate that the district court's findings of fact were clearly erroneous has a heavy burden to bear. *IPEC, Inc. v. International Litho. Corp.,* 869 F.2d 1080, 1083 (7th Cir.1989). The "clearly erroneous" standard means that the reviewing court must be left "with the definite and firm conviction that a mistake has been made." *Graefenhain v. Pabst Brewing Co.,* 870 F.2d 1198, 1201 (7th Cir. 1989) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 375, 68 S.Ct. 525, 92 L.Ed. 746 (1948)); *see also Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.,* 866 F.2d 228, 233 (7th Cir.1988) ("To be clearly erroneous, a decision must ... strike us as wrong with the force of a five-week-old, unrefrigerated dead fish."). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson,* 470 U.S. at 573–74, 105 S.Ct. at 1511.

We agree with the district court that defendants' actions constituted "a clear record of delay or contumacious conduct," *Webber,* 721 F.2d at 1069, and thus entry of default was appropriate. Defendants' repeated failure to comply with discovery, to obey court orders regarding same, and to appear for their depositions clearly constituted contumacious conduct which in turn caused almost ten months of unnecessary and prejudicial delay. This delay "seriously hampered [plaintiff's] trial preparations." *Hindmon v. National–Ben Franklin Life Ins. Corp.,* 677 F.2d 617, 621 (7th Cir.1982).

■ Defendants also argue that it was improper for the district court to enter default in this case, given the rule that in relatively young cases, a district court must first consider lesser sanctions. *Palmer v. City of Decatur,* 814 F.2d 426, 429 (7th Cir.1987). In *Webber,* this court held that a district court abused its discretion in dismissing an eighteen-month old case with prejudice where the plaintiff had little notice of the trial date, his conduct was not indicative of a lack of diligence in prosecuting the case, and there was "no evidence that defendant would have been unduly harmed or prejudiced" by the district court's granting the plaintiff's request for a continuance, 721 F.2d at 1071. This case, however, is distinguishable from *Webber,* because the government was prejudiced here by the Di Muccis' failure to comply with discovery.

Defendants seem to argue here (although it is difficult to tell) that their "discovery delay" was not prejudicial to the government's case for two reasons. First, the defendants argue that this delay could not have been prejudicial to the government because it did not originally move for a default. It merely moved for an order to compel attendance at the depositions. Second, defendants maintain that the fact that the government "still had refused to accept

the remaining material it had sought during discovery" at the time of the evidentiary hearing on affirmative relief before the magistrate showed that this delay was not prejudicial.

■ We disagree. First, the fact that the government initially did not seek entry of a default does not show that it was not prejudiced. Accepting this argument would amount to a rule that district courts could never *sua sponte* enter such a default. Second, as the district court noted in denying defendants' motion for reconsideration, "the remedial actions after the judgment of default do not excuse the months of egregious neglect." *Inryco*, 708 F.2d at 1234–35. We also do not think that defendants, as they repeatedly claim, provided all the overdue discovery. Repeating a doubtful fact several times does not serve to make it so.

## 2. Setting Aside the Default/Vacating the Default Judgment

Defendants also argue that the district court erred in refusing to set aside the default under Federal Rule of Civil Procedure 55(c). We reject this contention as well. We also do not think, although defendants' brief concentrates solely on the district court's initial refusal to set the default aside, that the district court incorrectly refused on reconsideration to vacate its entry of a default judgment against defendants.

■ In order to have an entry of default set aside or a default judgment vacated, defendants had to show: (1) good cause for their default; (2) quick action to correct it; and (3) a meritorious defense to the plaintiff's complaint. *Breuer Elec. Mfg. v. Toronado Sys. of Am.*, 687 F.2d 182, 185 (7th Cir.1982). The test is the same for relief under either Rule 55(c) or Rule 60(b), but is more liberally applied in the Rule 55(c) context. *Id.* at 187; *see also C.K.S. Eng'rs*, 726 F.2d at 1206.

Because the "good cause" requirement was not satisfied in this case, the district court was correct both in not setting aside its entry of default under Rule 55(c), and in denying relief to defendants upon reconsid-

eration. Although it is difficult to tell, defendants seem to argue that there was good cause for two reasons. First, they argue that the default should have been set aside because they had "substantially complied" with discovery, and had tendered "all outstanding documents" to the government at the first default hearing. We already have discussed, and rejected, these contentions above, in the context of whether a default properly was entered in this case.

Second, defendants argue that they were not aware of their counsel's misfeasance, or of the district court's warnings to counsel that it would enter a default. As a preliminary matter, we note that notice to a party's attorney constitutes notice to that party. *Link v. Wabash R.R.*, 370 U.S. 626, 633–34, 82 S.Ct. 1386, 1390, 8 L.Ed.2d 734 (1962). As the government points out, moreover, accepting the excuse that a litigant was not aware of its counsel's misfeasance (regardless of whether or not it is true) requires us to conclude, contrary to precedent in this circuit, that an attorney's acts cannot be imputed to his client.

In *Tolliver v. Northrop Corp.*, 786 F.2d 316, 319 (7th Cir.1986), we said:

> Although [the plaintiff] blames her lawyer for the failure, a litigant is bound by his lawyer's acts.... Holding the client responsible for the lawyer's deeds ensures that both clients and lawyers take care to comply. If the lawyer's neglect protected the client from ill consequences, neglect would become all too common. It would be a free good—the neglect would protect the client, and because the client could not suffer the lawyer would not suffer either.... The court's power to dismiss a case is designed both to illicit action from the parties in the case at hand and to induce litigants and lawyers in other cases to adhere to timetables.... A court cannot lightly excuse a litigant because of the lawyer's neglect without abandoning the pursuit of these objectives. [The plaintiff] does not suggest that supplying answers was not "within the meaningful control of the defaulting party, or its

attorney." ... She says only that her attorney was asleep on the job. ·

786 F.2d at 319 (quoting *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976); *Link,* 370 U.S. at 633–34, 82 S.Ct. at 1390; *C.K.S. Eng'rs,* 726 F.2d at 1206; *Boyle v. United States,* 710 F.2d 1251, 1257–58 (7th Cir.1983) (dissenting opinion), *rev'd,* 469 U.S. 241, 105 S.Ct. 687, 83 L.Ed. 2d 622 (1985); *Inryco,* 708 F.2d at 1234); *see also Pyramid Energy,* 869 F.2d at 1061–62; *Deppe v. Tripp,* 863 F.2d 1356, 1360 (7th Cir.1988); *Kagan v. Caterpillar Tractor Co.,* 795 F.2d 601, 608–09 (7th Cir. 1986).

Defendants attempt to distinguish *Tolliver* and *Inryco* on the ground that those cases arose in the Rule 60(b) context, and this case arises in the Rule 55(b) context.[10] They disagree with the district court's reasoning in its first memorandum opinion that "no principled distinction between that context and this exists." Defendants urge instead that we should follow the D.C. Circuit's holding in *Jackson v. Beech,* 636 F.2d 831, 837 (D.C.Cir.1980), where that court concluded that "the negligence of a lawyer is not imputed to his clients on a motion to set aside a default judgment." Defendants claim that *Jackson* is consistent with this court's holding in *Tolliver.* They argue that courts should "take notice of the attorney's behavior, but hold the client responsible when the client has been told of the court's pending sanction or is aware of the failure to abide by court orders." Naturally, defendants claim that in this case, they were not aware of any attorney misconduct or of the imminence of a default being entered against them.

 We find these arguments to be without merit. Initially, we agree with the district court that it makes no difference whether we are talking about the Rule 60(b) context or the Rule 55(c) context. It seems clear to us that the law in this circuit is that an attorney's conduct must be imputed to his client in *any* context. *Tolliver* does not say otherwise. We also disagree

that this situation can be distinguished from that in *Tolliver,* and that *Jackson* is consistent with this case. This is so for two reasons. First, we disagree with the defendants' contention that they were not aware of their own counsel's actions or of the district court's warnings. The district court evidently credited Gubbins', and not Salvatore Di Mucci's, version of events. We do not think that this was clearly erroneous. Second, a distinction such as that which defendants urge us to adopt would amount to a rule that a client could escape the consequences of his attorney's neglect by deliberately failing to inform himself of ongoing proceedings. We have no intention of creating such a rule; rather, our view is to the contrary. *See Boyle,* 710 F.2d at 1257–58.

### B. *Appropriateness of Affirmative Relief*

In addition to contending that the district court erred in entering default in this case, and in refusing to set it aside, defendants argue, in a rather jumbled fashion, three things. First, they argue that the facts of this case do not support the government's entitlement to relief. Second, they argue that even if the government were entitled to relief, the injunctive relief ordered in this case was inappropriate. Finally, defendants argue that the evidentiary hearing held by the magistrate was improperly conducted, denying them due process. We will address these contentions in turn.

#### 1. Entitlement to Relief

The parties dispute the correct legal standard to have been applied by the magistrate. Defendants contend that the government had to show both that defendants had engaged in a pattern or practice of discrimination under the Fair Housing Act and that defendants were engaging in current violations of the Fair Housing Act. The government contends that the entry of a default judgment against the Di Muccis entitled it to injunctive relief without any further showing. Alternatively, it argues

---

**10.** As we discuss above, the defendant's motion for reconsideration was in effect treated as a motion for relief under Rule 60(b). *See supra* note 6.

that affirmative relief was justified by the evidence adduced by the magistrate at the evidentiary hearing. The government also claims that no showing of current violations was necessary, but rather that the defendants failed to rebut the inference of continuing discrimination.

We agree with the government that it is not normally required to show at the injunctive relief stage of a case such as this that defendants engaged in a pattern or practice of discrimination in violation of the Fair Housing Act.[11] The Supreme Court's opinion in *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), a Title VII class action case, provides us with guidance here.[12] There, the Supreme Court said:

> If an employer fails to rebut the inference that arises from the Government's prima facie case, a trial court may then conclude that a violation has occurred and determine the appropriate remedy. Without any further evidence from the Government, a court's finding of a pattern or practice justifies an award of prospective relief.

431 U.S. at 361, 97 S.Ct. at 1867. The Court also notes that the force of proof by the government of a pattern or practice carries over to the remedial phase of the trial. 431 U.S. at 362–63, 97 S.Ct. at 1868.

As a general rule, a default judgment establishes, as a matter of law, that defendants are liable to plaintiff as to each cause of action alleged in the complaint. *Dundee Cement Co. v. Howard Pipe & Concrete Prods.*, 722 F.2d 1319, 1323 (7th Cir.1983); *Breuer Elec.*, 687 F.2d at 186.

Thus, entry of the default judgment established that defendants violated the Fair Housing Act.

In this case, however, the fact that the government generally does not have to introduce evidence of a pattern or practice of discrimination at the relief stage of a case such as this is of little moment. Because the Di Muccis' liability was established by default, the law in this circuit indicates that in a case such as this, an evidentiary hearing may be required to establish what type of relief is necessary. Although upon default, the well-pleaded allegations of a complaint relating to liability are taken as true, allegations in a complaint relating to the amount of damages suffered ordinarily are not. *Dundee*, 722 F.2d at 1323. Rule 55(b)(2) of the Federal Rules of Civil Procedure provides in part that "if, in order to enable the court to enter judgment or to carry it into effect, it is necessary ... to establish the truth of any averments by evidence ... the court may conduct" a hearing. A judgment by default may not be entered without a hearing on damages unless the amount claimed is liquidated or capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits. *Id.* at 1323.

The magistrate treated this case as if it were a case presenting unliquidated damages required to be determined by hearing. She noted, however, that unlike an unliquidated damages case, where the issue of damages is separate from the facts decided by the default, the facts establishing the necessity for affirmative injunctive relief

---

**11.** In order for a "pattern or practice" of discrimination to be established, the government must prove "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts. It [has] to establish by a preponderance of the evidence that racial discrimination [is the defendants'] standard operating procedure—the regular rather than the unusual practice." *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 336–38 & n. 16, 97 S.Ct. 1843, 1854–55 & n. 16, 52 L.Ed.2d 396 (1977); *accord Coates v. Johnson & Johnson*, 756 F.2d 524, 532 (7th Cir.1985). The phrase "pattern or practice" was not intended as a term of art, but appears in several federal civil rights statutes, and is

interpreted consistently therein. *See Teamsters*, 431 U.S. at 336 n. 16, 97 S.Ct. at 1855 n. 16.

**12.** Courts in Fair Housing Act cases have adopted the interpretation of certain portions of Title VII in analogous cases as instructive. *See Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1288–89 (7th Cir.1977) (in determining that in order to make out a *prima facie* case of discriminatory impact under the Fair Housing Act, one need not necessarily show discriminatory intent, court of appeals noted that Congress intended that Title VII would not always require such a showing).

are not likely to be different from the facts already legally determined by the entry of the default judgment. *See, e.g., United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918, 944 (10th Cir.1979) (listing factors necessary under Title VII for entitlement to affirmative relief). In any event, it was proper for the magistrate first to determine whether an injunction was necessary, and if so, what that decree should provide. Thus, it was necessary, in effect, for the government to show *in this case* that defendants engaged in a pattern or practice of discrimination. We agree with the government, however, that it did meet this burden.

In *United States v. W.T. Grant Co.*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), the Supreme Court said:

> The purpose of an injunction is to prevent future violations, . . . and, of course, it can be utilized even without a showing of past wrongs. But the moving party must satisfy the court that relief is needed. *The necessary determination is that there exists some cognizable danger of recurrent violation,* something more than the mere possibility which serves to keep the case alive.

345 U.S. at 633, 73 S.Ct. at 898 (emphasis supplied).

Defendants argue that the district court erred in determining that affirmative injunctive relief can be ordered without a showing of current violations. The district court failed to give any weight, defendants maintain, to the fact that they were subject to a negative injunction for two years without incident. The burden is upon the government, moreover, they claim, to show the threat of future violations.

█ Numerous factors, however, are to be considered in determining whether injunctive relief is appropriate, or in fashioning relief under an injunctive decree once the court has determined that such a remedy is necessary. These factors include the bona fide intention of the party found guilty of discrimination to presently comply with the law, the effective discontinuance of the discriminatory practices in question, and in some cases, the character of past violations. *W.T. Grant Co.*, 345 U.S. at 633, 73 S.Ct. at 898; *accord United States v. Warwick Mobile Homes Estates, Inc.*, 558 F.2d 194, 197 (4th Cir.1977); *United States v. Hunter*, 459 F.2d 205, 219 (4th Cir.), *cert. denied*, 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972). In other words, affirmative injunctive relief for past discriminatory practices is appropriate where the trial court believes that "the vestiges of prior discrimination linger and remain to be eliminated." *Hunter*, 459 F.2d at 220 n. 21; *accord Saunders v. General Servs. Corp.*, 659 F.Supp. 1042, 1059–60 (E.D.Va. 1987).

█ As noted above, the force of proof by the government that defendants have engaged in a pattern or practice of discrimination carries over to the remedial phase of a proceeding. A defendant can rebut the presumption of entitlement to affirmative injunctive relief by showing that such relief is not necessary because there is little or no danger of current violations. *Cf. Teamsters*, 431 U.S. at 361–62, 97 S.Ct. at 1868 (once the government has shown pattern or practice in liability phase of Title VII class action case, the burden shifts during the remedial phase to the employer to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons); *Caviale v. Wisconsin Dep't of Health & Soc. Servs.*, 744 F.2d 1289, 1296 (7th Cir.1984) (in Title VII case, burden of proof was on the defendant to show that the plaintiff would not have appointed to the position at issue even absent discrimination). The absence of any persuasive indications that a past pattern or practice of discrimination has ceased may justify injunctive relief. *Warwick Mobile Homes Estates*, 558 F.2d at 197; *United States v. West Peachtree Tenth Corp.*, 437 F.2d 221, 228 (5th Cir.1971); *see also Lee Way Motor Freight*, 625 F.2d at 943 ("[W]hen a practice such as that which we find in this case had actually become a way of life for the [defendant], there is little basis for assuming that the [defendant] is going to get religion, so to speak, overnight.").

As we discussed above, the magistrate found that defendants refused on occasion to rent to black bona fide apartment seekers, gave black and white testers differing information on the availability of apartments, and treated black testers significantly differently from white testers. We agree with the magistrate that these incidents established the existence of a pattern or practice of discrimination. As the district court pointed out, courts have granted relief based on fewer incidents than these. *See, e.g., United States v. Pelzer Realty Co.*, 484 F.2d 438 (5th Cir. 1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974).

Defendants attempt to explain away each incident of discrimination. The magistrate's detailed findings of fact, however, clearly credited the United States', and not the defendants', version of events in many instances. "Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574, 105 S.Ct. at 1511; *see also Hayden v. Oak Terrace Apts.*, 808 F.2d 1269, 1272 (7th Cir.1987) (quoting *Ratliff v. City of Milwaukee*, 795 F.2d 612, 617 (7th Cir.1986)) (appellee must show "that the credited testimony is 'incoherent, internally inconsistent, implausible on its face, or contradicted by extrinsic evidence' ").

Likewise, we agree with the government that the Di Muccis failed to rebut the presumption that this discrimination was continuing. As the magistrate pointed out, defendants did not take steps to remove any of the offending rental agents, despite their stated refusal to sign affidavits saying they would comply with the law. Moreover, the incidents of discrimination found by the magistrate were much more recent when the suit originally was filed. We agree with the government that defendants should not be able to turn their self-occasioned delay to their advantage. Thus, entry of an injunction against the defendants was proper.

### 2. Appropriateness of Relief Order

Defendants also argue, in the event that injunctive relief is proper, that the injunction issued in this case is overbroad, punitive, and not responsive to conduct in evidence. First, they argue that the government did not show evidence to sustain the allegations in its complaint. We have discussed (and dismissed) this contention above.

Defendants also contend that the relief granted in this case runs afoul of the Fourth Circuit's decision in *Hunter*. Although they do not indicate against which "dictates" in *Hunter* the district court's decision goes, the Fourth Circuit said in that case: "Established principles of equity dictate that in considering whether to grant injunctive relief a court should impose upon a defendant no restriction greater than necessary to protect the plaintiff from the injury of which he complains." 459 F.2d at 219.

Defendants take issue with paragraphs 5 and 6 of the order, which require the Di Muccis themselves and the rental agents to sign statements acknowledging that they have read the order, understand it, and recognize that a violation of it could lead to proceedings for contempt. We agree with the government that there certainly is nothing objectionable in requiring defendants themselves to sign such a statement. Moreover, it is not untoward for the district court to require defendants' rental agents to sign such affidavits.

Defendants argue that requiring agents to sign such an order would have an "unwarranted *in terrorem* " effect, making it difficult for them to find or hire sales personnel. As the district court pointed out, however, it is unlikely that someone who intends to comply with the Fair Housing laws would have any difficulty in signing such an affidavit. Second, this type of relief is particularly appropriate in this case, where, as the magistrate points out, it was evident that defendants' current employees do not understand their responsibilities under the district court's order, or the legal effect on them of the injunction already in effect. Defendants also assert that their employees are not bound by the district court's decree. This view is errone-

ous. Federal Rule of Civil Procedure 65(d) provides that an injunction binds agents and employees of the defendants.

■ Defendants also argue that paragraphs 12 and 13 are punitive and unsupported by the evidence. These paragraphs (1) require defendants' employees and agents to inform prospective tenants of all the available apartments, and (2) require, for a period of three years, that defendants furnish monthly vacancy lists to one or more agencies that frequently refer minority apartment seekers.

The Di Muccis first contend that these paragraphs are punitive because the percentage of blacks living in the complex already exceeds that in the general population in Mount Prospect and actually has increased since 1983. As the government points out, however, the magistrate noted at the hearing that "perhaps five out of 40 or 12.5% of persons looking at apartments in [defendants'] complex each week are black." Thus, very few of the black people who visit defendants' buildings end up renting there. Moreover, while the minority population in Mount Prospect and other northwest suburbs is less than 1% of the total population, the same is not true of the greater Chicago area. Thus, injunctive relief of this type is appropriate.

Second, defendants argue that requiring them to furnish a list of available apartments would destroy their ability to compete in the rental marketplace, because availability can change from hour to hour during the busy season. The magistrate rejected this argument in the district court because the evidence showed (and we agree) that prospective white tenants were told about more than one available apartment, while black persons were told that one or no apartment vacancies existed. Thus, this type of relief also is appropriate. Moreover, it is typical. *See, e.g., United States v. Youritan Constr. Co.,* 370 F.Supp. 643 (N.D.Cal.1973), *aff'd in part,* *remanded in part,* 509 F.2d 623 (9th Cir. 1975).

### 3. Denial of "Due Process" [13]

Defendants' "due process" argument is fourfold. First, they contend that the district court erred in not placing the burden of proof that affirmative relief was necessary on the government. As the government points out, however, the magistrate did in fact find that the government was required to prove that affirmative relief was appropriate. She also found that it did in fact meet this burden. It is defendants who, as discussed above, failed to properly rebut the inference of continuing discrimination.

Second, in what is not, we suppose, an unprecedented case of "the pot calling the kettle black," defendants charge that they were denied discovery of the plaintiffs' evidence. Defendants argue that the government should have disclosed the evidence it had of a "pattern and practice" in violation of the Fair Housing Act before the entry of default. Before the entry of default, however, defendants issued only one discovery request. The government complied with this request, furnishing all the tester reports to defendants. Although the government did not acquire evidence of the "Hicks incident" [14] until after the entry of default, it indicated in its memorandum in support of entry of a default judgment that it would have called him at trial.

Third, defendants argue that the government neglected its duty to supplement discovery under Rule 26(e)(2) of the Federal Rules of Civil Procedure. They maintain that government should have told them that it was going to call Tina Meadows as a witness at the evidentiary hearing. Since it did not, this testimony should have been excluded. *See Holiday Inns, Inc. v. Robershaw Controls Co.,* 560 F.2d 856, 858 (7th Cir.1977). We disagree with defen-

**13.** Defendants raise what are really four separate issues in three pages of their brief, citing little authority. This court generally considers issues briefed in such a perfunctory manner to be waived by the parties. *Cf. Ordower v. Feldman,* 826 F.2d 1569, 1576 (7th Cir.1987) (issue raised in last paragraph of brief without citation to authority was deemed waived). We address these contentions briefly nonetheless.

**14.** *See supra* note 6.

dants' reading of *Holiday Inns*. Although it is true that the government's affidavit in support of entry of a default judgment only described Meadows as "a former rental agent ... [who] ... worked at the Cottonwood/Alpine rental office within the last four years," we do not think that the government erred here in failing to supplement its earlier discovery response. First, this affidavit was prepared in support of entry of a default judgment, not in anticipation of a hearing being conducted on the issue of damages. Thus, the government was under no duty at that time to identify Meadows. Second, as the government points out in its brief, it could not locate Meadows until the hearing was underway. Thus, under the peculiar circumstances of this case, we do not think that the government's failure to inform defendants in advance that it was going to call Meadows as a witness required exclusion of that evidence, when the government did not even know this itself. This is hardly a case where the government was trying to "surprise" defendants.[15]

Finally, defendants argue that the magistrate and the district court made improper use of tester reports which were not admitted into evidence in determining that affirmative relief was appropriate. They claim that the government also failed to seek admission of numerous tester reports that did not support its case.

As the government points out, however, it did in fact seek admission of all the tester reports it had compiled as business records, but not all of them were admitted into evidence. The government also notes that the magistrate did not rely upon the tester reports as to which no testimony was offered in evidence. She found them "inconclusive." Therefore, we do not think that defendants were prejudiced by the fact that the magistrate mentioned these reports in her opinion, but found them inconclusive.

### III. Conclusion

For the reasons discussed above, the judgment of the district court is AFFIRMED.

---

15. As the government also points out, defendants in fact seemed to have little difficulty in cross-examining Meadows and in producing rental agents whose testimony was elicited to impeach Meadows' testimony. Thus, it is difficult for defendants to claim that they were prejudiced here.