Wentworth T. DURANT, Jr., and Susan B. Durant, Plaintiffs-Appellees,

v.

SURETY HOMES CORPORATION, an Illinois Corporation, Defendant-Appellant.

No. 77–2045.

United States Court of Appeals, Seventh Circuit.

Argued April 14, 1978.

Decided Aug. 8, 1978.

Robert Marks, Chicago, Ill., for defendant-appellant.

Robert W. Patterson, Michael M. Conway, Hopkins, Sutter, Mulroy, Davis & Cromartie, Chicago, Ill., for plaintiffs-appellees.

Before PELL, TONE and WOOD, Circuit Judges.

PELL, Circuit Judge.

In this diversity case, plaintiffs Wentworth T. Durant, Jr., and Susan B. Durant sued Surety Homes Corporation (Surety), claiming material defects in a new house sold to them by Surety and asserting liability on grounds of fraud, breach of express and implied warranties, and negligence in construction.[1] At the trial of the cause, the jury returned a verdict finding liability of Surety for $70,000 actual damages and $30,000 punitive damages. In response to timely post-trial motions, the district court decided that it had erred in submitting to the jury the question of compensatory damages for emotional distress suffered by the Durants. The court's denial of Surety's new trial motion was therefore conditioned on the Durants' filing of a remittitur reducing the compensatory award to $22,225, which represented the court's view of the portion of the award attributable to proper compensatory damages. A remittitur being timely filed by the Durants, final judgment in the amount of $52,225 was entered, being the $30,000 punitive damages plus the allowed compensatory damages. This appeal followed.

The facts are as follows. The house in question was originally built by Surety for one Sonetz, an electrician. Surety poured the building foundations into frozen ground in January or February of 1973, and by March, when the ground had thawed, a center foundation wall had settled significantly and cracks in two exterior walls had developed. Sonetz, understandably upset, complained to his Surety salesman, Vance Modersohn, who reported the problem to Milton Kaufman, Marketing Vice President of Surety.[2] Sonetz sought cancellation of his sales contract, which was granted. Kaufman referred the matter to Surety's construction department, which made un-

---

1. The same complaint alleged claims against the Durants' mortgage lender, Olympic Savings and Loan Association, arising out of the house sale transaction. A settlement between the parties eliminated all claims save one based on Illinois' usury laws, and the district court's disposition of this claim is the subject of a separate appeal, 582 F.2d 1090, which was argued to this panel on the same day as was this appeal.

2. Kaufman possessed authority to enter into contracts; Modersohn did not.

disputedly inadequate repairs. The house was subsequently completed, but was kept off the market for over a year, until the Durants entered the picture.

Mr. Durant, having received an attractive offer of employment with a Chicago firm, came to Chicago with his wife from Texas, their residence state, in April 1974 to locate a home. They looked at Surety's Ivanhoe subdivision, and found the Nottingham model home to their liking. Modersohn told them that no Nottingham homes were then available and that it would take 90 days to build one. When the Durants said they could not wait that long, Modersohn called Kaufman, who authorized the offering of the Sonetz house, a Nottingham model, which could be readied for occupancy in two or three weeks. Modersohn told the Durants Sonetz had run out of money to buy the house, and had left extra quality electrical work therein for which no additional charge would be made. Kaufman directed no disclosures about the foundation problems, and Modersohn made none. Both men testified that they believed the defects to have been remedied. A contract of sale was soon made. Just prior to closing the sale, Mr. Durant was taken on a final inspection of the house, in the course of which he asked the Surety representative to open the hatch into the crawlspace (from which the defects were visible), but the representative said he had no screwdriver at the time.

About a week after the closing, Mr. Durant was advised by a neighbor that there had been foundation cracks previously. Durant inspected the crawlspace, found the defects, and thereafter complained to Surety and to building officials of the Village of Bolingbrook. The Building Commissioner inspected the house, and issued a "red tag" indicating that it was unsafe for occupancy. Mr. Durant was given permission to live alone in the house with minimal lightweight furniture, to protect his home from fire and vandalism. His wife, needless to say, was unable to move to Chicago to join him. At the end of January 1975, necessary repairs still not having been made,[3] Durant resigned from his position in Chicago and returned to Texas.

I.

Surety conceded its negligence in construction at trial, so liability for the reasonable costs of repairing the defects was not in issue, although the amount of those costs was. The jury was so charged, and was also told, quite properly, that if it should find the house to be uninhabitable, plaintiffs were additionally entitled to recover the reasonable rental value of the house during the period of uninhabitability. The district court also instructed the jury that if and only if it found in the Durants' favor on the issue of fraud, it could consider awarding damages both to compensate the Durants for the mental distress they suffered and to punish Surety. Evidence of the mental distress had been admitted at trial. There can be no doubt that the jury's $70,000 actual damages verdict included an amount for mental distress, as the evidence on repair and rental damages most favorable to the Durants would not have supported a verdict for even half that amount. Because the form of verdict given to the jury invited it to specify its allocation of damages only between those compensatory and those punitive,[4] it is impossible to know

---

3. Durant had asked Surety either to rescind the sales contract and refund his money or to make the repairs specified by the Building Commissioner. Surety refused to refund the purchase price, and offered only to make the less substantial repairs called for in the report of Carl Abel, an engineer. Durant rejected this proposal because it would not result in obtaining an occupancy permit and did not express intent to remedy all the defects.

4. We decline the invitation of the parties to hold the other side responsible for the form of

verdict and the resulting lack of certainty on the jury's findings of the elements of damages. Neither party followed through on plaintiffs' counsel's suggestion (in which defense counsel found merit, assuming that mental distress and punitive damage issues would be sent to the jury over defendant's objection) that a more specific verdict form be used. Obviously, such a procedure would have been well-advised, but we do not think justice would be served by holding either side wholly responsible for a

precisely how the jury divided the damages among the categories of what it had been instructed were proper compensatory damages.

After trial, as we have said, the court decided it had erred in sending the mental distress damages issue to the jury, and proposed a remittitur in an attempt to cure the error. Surety argues that such a cure was impossible here. Before considering whether or not that is so, we address briefly the Durants' suggestion that there was no error in sending the mental distress issue to the jury in the first place. Clearly, a plaintiff who accepts a remittitur may not appeal from the district court order proposing it as an alternative to a new trial. *Donovan v. Penn Shipping Co., Inc.*, 429 U.S. 648, 650, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977). On the other hand, a prevailing party may quite properly defend his judgment on any ground supported by the record. *Dandridge v. Williams*, 397 U.S. 471, 475, n.6, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). For the limited purpose of defending the remitted judgment they have accepted, we believe the Durants are entitled to argue that the district court erred in conditioning the denial of Surety's new trial motion on the acceptance of a remittitur.

The argument itself, however, is without merit. To recover on a mental distress theory in Illinois, a plaintiff must prove that the defendant acted in a way "calculated to cause 'severe emotional distress' to a person of ordinary sensibilities, in the absence of special knowledge or notice." *Knierim v. Izzo*, 22 Ill.2d 73, 86, 174 N.E.2d 157, 164 (1961). The district court determined that there was simply no evidence of intention to cause such distress here. The Durants counter by articulating the theory that Surety refused to accede to their demands in an attempt to browbeat them into accepting inadequate repairs. This court recognized the sufficiency of complaint allegations which were superficially similar in *Eckenrode v. Life of America Insurance Company*, 470 F.2d 1 (7th Cir. 1972). But the complaint there alleged that a life insurer refused to pay benefits which it knew full well it was obliged to pay, specifically to harass and browbeat a recently bereaved widow in desperate need of the insurance proceeds to accept less than her due. The court expressly distinguished situations where an insurer merely insists on arguable legal rights. Here, the undisputed evidence was that Surety received expert reports that the defects could be remedied more cheaply than the Durants were demanding, so this situation is clearly, less extreme than in *Eckenrode*. Moreover, *Eckenrode* involved the sufficiency of a complaint, the allegations of which were taken as true. This case has been tried, and the Durants make no effort to point out any evidence adduced that would support the inference that Surety knew it was baselessly resisting the Durants' demands and intended to inflict distress on them.

We conclude, therefore, that the district court was correct in deciding that the jury should not have been given the mental distress damages issue. It is understandable, moreover, that the court, having perceived its error, would attempt to salvage the product of the trial if possible. Nonetheless, we believe the court partially erred in so attempting.

As a general proposition, subject to exceptions inapposite here,[5] "[i]t is a deprivation of the right to a jury trial for the court to alter the verdict in matters of substance." *Myrtle v. Checker Taxi Company, Inc.*, 279 F.2d 930, 934 (7th Cir. 1960). Where, as here, there are multiple elements of compensatory damages put to the jury, and its verdict thereon is in general form, it

mutual failure to follow through on a sound suggestion.

**5.** A classic exception arises in situations where the jury has returned a clearly excessive verdict without being inflamed by passion or bias. *See, e. g., Ehret Company v. Eaton, Yale &* *Towne, Inc.*, 523 F.2d 280, 285 (7th Cir. 1975), cert. denied, 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 186 (1976); *Curtis Publishing Company v. Butts*, 351 F.2d 702, 718–19 & n.45 (5th Cir. 1965), aff'd 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

is not proper for the court to attempt to segregate out elements which should not have gone to the jury by making its own assessment of the proven damages on the legitimate elements. *Jayne v. Loder*, 149 F. 21, 23 (3d Cir. 1906). The problem, of course, is that the jury may or may not have reached the same conclusions as the court on the proper damage elements. It may in fact have relied wholly or substantially on what the court later decides to have been improper elements. In the context of this case, it is appropriate to add that the improper element, mental distress damages, is inherently capable of great elasticity in the hands of the jury.

■ The only approach legitimately available to the district court when faced with the problem that developed here was to offer a remittitur to an amount not disputed. In *Koenigsberger v. Richmond Silver Mining Company*, 158 U.S. 41, 15 S.Ct. 751, 39 L.Ed. 889 (1895), a remittitur had been ordered to an amount no greater than supported by the defendant's testimony as to the plaintiff's damages. The Supreme Court approved this result. Because the record

> afford[ed] the means of distinguishing so much of the plaintiff's claim as was in dispute from that part which was practically not disputed, the court, without invading the province of the jury, might permit the plaintiff, in lieu of a new trial, to take judgment for the latter part only.

*Id.* at 52–53, 15 S.Ct. at 756; *see also Staplin v. Maritime Overseas Corp.*, 519 F.2d 969 (2d Cir. 1975); *Joiner Systems, Inc. v. AVM Corporation, Inc.*, 517 F.2d 45 (3d Cir. 1975).

The district court allocated $7,225 of the damage award to lost rental value. The parties had stipulated that the reasonable rental value was $425 per month, and the court arrived at its figure by multiplying the stipulated figure by the 17 months between the Durants' taking possession of the house and their transferring title to the

mortgage company for release from the mortgage. Surety argues that 17 months of rental value was grossly excessive, but we think this argument comes far too late. Although the parties did not stipulate as to the use of a 17-month period, the "red tag" denying occupancy of the house remained in force during the entire time the Durants owned the house. Perhaps for this reason, the court instructed the jury that if it found the house uninhabitable "then the plaintiffs are also entitled to recover the reasonable rental value of the Galahad [Road] property for a period of approximately 17 months. That is to say, from the time it was purchased until it was sold in December of 1975 [sic: 1976]." The court also instructed as to the stipulation, and told the jury "17 months times 425 runs some $7,225. And those are figures that I suggest to you that you can rely upon, provided that you first find that the house was uninhabitable."

■ Surety does not deny that the jury must have found uninhabitability, and indeed in view of the undisputed evidence that the Durants did not have the permission of the Village to occupy the home as a residence, such a denial would be ludicrous. They do suggest that repairs could have been made in as little as three days if the Durants had cooperated, and that the lost rental value therefore could be as little as $42. The fatal difficulty with the argument is that the jury was instructed, if uninhabitability was found, to include $7,225 in rental damages in its verdict, and we therefore must presume that it did so. Insofar as the argument is that the district court should not have given that instruction, it was waived by Surety's failure to lodge an objection thereto either before the instruction was given, or afterwards (an opportunity having been provided) if the court deviated from its previously announced intentions in giving the instruction.[6] Fed.R.Civ.P. 51. We conclude that the district court could properly find that

---

6. No transcript was made of the informal instruction conference, so we cannot know if this was the case. It is immaterial, however, because both the formal pre-instruction objection conference and the post-instruction opportunity were transcribed, and no objection was made.

the jury returned a verdict of $7,225 for lost rental damages, and could therefore include that figure in the proposed remittitur.

The district court also included in its proposed remittitur $15,000 for the reasonable costs of repairs to the home. We believe this was error. It is true that plaintiffs' expert witness Hurley itemized what he viewed as necessary repairs and estimated their cost at $10,000 to $12,000, and that he estimated the additional costs of some work called for by the Bolingbrook Building Commissioner at $1,000 to $1,500. He also testified that if the entire foundation needed replacing (which could not be determined without fairly extensive excavation and testing which he was unable to perform) the cost of repairs could be as high as $25,000. This evidence was, however, disputed. Surety's main expert witness Hoffman took specific issue with the repairs specified by Hurley, gave his own recommendations for repair, and estimated their cost at $4,500 to $4,700. He had given this advice to Surety, and although it did not do everything he recommended in the manner he suggested, he found its repairs, upon inspection, to be equally sound. Surety's repairs cost $1,625. Hoffman agreed that if Hurley's soil test findings were accurate, the repairs could cost $15,000, but he expressed his opinion that these findings were unreliable. He had relied on the tests made by another of Surety's experts, Walters.

■ As the testimony just summarized clearly indicates, there was a real factual dispute at trial over the costs of repairs. We believe the district court was quite correct when it instructed the jury: "You gentlemen heard the testimony, and it is peculiarly your responsibility to decide the reasonable cost to repair the home . . . ." Accordingly, the only figure the court could permissibly have proposed for inclusion in the remittitur, without invading the province of the jury, was the $1,625 figure supported by Surety's evidence. It is no answer to suggest, as do the Durants, that Walters and his soil test findings were se-

verely impeached at trial. Credibility, of course is the quintessential question for the exclusive determination of the trier of fact. The district court's judgment of $22,225 in actual damages must be reversed. On remand, the court will be free to condition denial of Surety's new trial motion on acceptance of a remittitur to $8,850 in actual damages, the sum of the $7,225 the jury obviously found in lost rental damages and the $1,625 in reasonable costs of repair as to which there was no dispute. In the event of lack of disposition by this route, the judgment as to liability only for compensatory damages for negligence and fraud shall stand affirmed, and the amount of such damages shall be determined by a new trial thereon.

## II.

■ Surety argues that the jury should not have been allowed to award punitive damages, for two reasons. First, it argues that punitive damages are improper, even in fraud cases, unless the jury could permissibly find that the defendant acted willfully, wantonly, with malice, or in reckless disregard of the rights of others. See, e. g., *Gass v. Gamble-Skogmo, Inc.*, 357 F.2d 215, 220 (7th Cir. 1966); *Laughlin v. Hopkinson*, 292 Ill. 80, 89, 126 N.E. 591 (1920); *Miller v. Simon*, 100 Ill.App.2d 6, 11, 241 N.E.2d 697 (1968). The Durants agree that this is the law, but insist that the jury could properly find such aggravating circumstances from the evidence before it. The district court accepted the Durants' position, as do we.

■ The jury was properly instructed on this issue, as Surety admits. Its verdict necessarily reflects a conclusion that Surety not only committed fraud, but also did so designedly or wantonly, with reckless disregard for the Durants' rights. That conclusion could have been set aside by the district court only if the court was clearly satisfied that it was wholly unwarranted from the manifest weight of the evidence.[7] *Kahn v. James Burton Company*, 5 Ill.2d

---

7. The court may also set aside a verdict if clearly satisfied that it was the result of pas-

sion or prejudice. *Kahn, supra.* Surety's argument that this was so is addressed *infra.*

614, 623, 126 N.E.2d 836 (1955); *Lau v. West Towns Bus Company*, 16 Ill.2d 442, 451, 158 N.E.2d 63 (1959); *Torrez v. Raag*, 43 Ill.App.3d 779, 2 Ill.Dec. 465, 357 N.E.2d 632, 634 (1976). As a motion for a new trial is addressed to the sound discretion of the trial judge, our review is even more narrowly circumscribed. *Id.*

We find no abuse of discretion. In the nature of things, the transcript of a trial in a fraud case will seldom reveal admissions by the defendant that his conduct was not only fraudulent but intentionally, willfully, or recklessly so. Here, as Surety points out, both Modersohn and Kaufman testified to the contrary to the effect that they did not know the house's defects had not been remedied. Both denied concocting a scheme to conceal the defects from the Durants. Yet the jury was surely free to disbelieve these understandably self-serving assertions, and the record shows beyond a doubt that there was an intentional concealment at least· of the history of defects in this house, and that Surety had a strong motive to conceal whatever it knew. The Durants had made it clear they were not in a position to wait for Surety to build a house for them. If they purchased from Surety it would be a Nottingham model. An inference that Kaufman authorized sale of the only house meeting that requirement, being one which Surety had regarded for over a year as unmarketable, in an attempt to avoid losing willing buyers, with knowledge of or at least reckless indifference to the problems involved, surely would not have been wholly unwarranted from the manifest weight of the evidence. The inference would receive at least some support from the incident in which Mr. Durant asked to see the crawlspace, and from the fact that Surety's construction superintendent, who supposedly certified the home to Kaufman as fully repaired, was not called to testify.

█ Surety insists that if there was outrageous conduct susceptible of a punitive damage award, it was that of Modersohn, not that of Surety. It cites *Mattyasovszky v. West Towns Bus Company*, 61 Ill.2d 31, 36–37, 330 N.E.2d 509, 512 (1975); and *Tolle v. Interstate Truck Lines, Inc.*, 42 Ill.App.3d 771, 1 Ill.Dec. 437, 356 N.E.2d 625 (1976), for the proposition that an innocent principal is not liable for punitive damages arising out of the conduct of its agent. Modersohn, it argues, was not a sufficiently high-ranking employee to make Surety liable for punishment. The problem with the argument is that Kaufman was such an employee, and the jury could permissibly find that Kaufman either authorized Modersohn's fraud or ratified it, either of which is sufficient under the cited authorities.

In accordance with the foregoing, the judgment of the district court upon remand will stand affirmed as to the punitive damages both as to liability and as to amount.

### III.

█ Surety's final argument is that several trial errors combined to render the jury's verdict a product of passion and prejudice. First, it complains of allowing the jury to hear the evidence of the Durants' difficulties when their house proved uninhabitable. Although punitive damages are not allowed for the purpose of compensating the plaintiff for his loss, the circumstances in which the plaintiff is put are relevant in determining the outrageousness of the defendant's conduct. *See Bucher v. Krause*, 200 F.2d 576, 587 (7th Cir. 1952); *cert. denied*, 345 U.S. 997, 73 S.Ct. 1141, 97 L.Ed. 1404 (1953). Although there is no evidence that all of the details of the Durants' difficulties were communicated to Surety as they developed, Surety was shown to have had at least general knowledge thereof. We see no error in the district court's conclusion that there was no real likelihood of creating passion or prejudice, at least in the circumstances of this case. In an ironic way, the court's error in allowing the jury to award mental suffering damages meaningfully reduced the risk of prejudice in the punitive portion of the award, because the jury was clearly told in the event of plaintiffs' verdict to compensate the Durants only for their actual damages and that any punitive damages award should be limited to punishment for Surety.

■ During the course of trial, most of the witnesses who testified about the house defects, including defense witnesses made use of enlarged photographs thereof introduced by the Durants. Surety does not attack the accuracy or admissibility of the photographs *per se*, but claims error in allowing enlarged photographs to be used and in permitting their display throughout the trial. We have viewed the photographs, and find nothing inflammatory about them. There is no indication that enlarging the pictures in question resulted in any distortion of the matters depicted. Enlarged photographs are frequently used in trials because of their capability of being simultaneously viewed by all members of the jury. The process of passing small pictures with only oral identification from juror to juror is not only a tedious one but is unnecessarily delaying in the forward progress of the trial. Also, the jury can better understand a witness who is testifying as to matters in a photograph when it is enlarged and the jurors can all see that to which reference is being made. The photographs were clearly relevant and under Rule 402, Fed.R.Evid., were admissible. The admissibility of photographs even prior to the effectiveness of the Federal Rules of Evidence was within the sound discretion of the trial judge. *Pitrowski v. New York, Chicago & St. Louis Railroad Co.*, 6 Ill.App.2d 495, 499, 128 N.E.2d 577 (1955). This is not a case of misuse of photographs, submitting blowups of otherwise admissible pictures, not, in our opinion, being a misuse. The matters shown were as they actually existed at the pertinent times. The seriousness of the defects here was very much in issue, the district court determined that the photos would be helpful to the jury in the course of extensive testimony on that subject, and we are satisfied that the court was well within its substantial discretion in so deciding.[8]

■ While cross-examining Kaufman, counsel for the Durants began the following question, with reference to the Moder-

sohn-Kaufman telephone call previously described: "Didn't Mr. Modersohn say something to this effect: 'Mr. Kaufman, I have a hot buyer for the old Sonetz home and if we don't sell it, we won't be able to—'?" Surety's counsel objected, the district court ascertained that there was no evidence of such conversation in the record and that counsel for the Durants was not prepared to prove one, and the court then admonished counsel and instructed the jury to disregard the question. Obviously, the question was improper, but we agree with the district court that its prompt intervention eliminated any chance of prejudice.

■ Nor did the Durants' counsel's unadorned reference in closing argument to "that infamous telephone call . . . which only you can infer what was precisely said," or his suggestion that Surety decided to stick anxious buyers with a defective home, create improper prejudice. This, after all, was a part of plaintiffs' theory of the case, and suggesting inferences to a jury in final argument without misstating the supporting evidence is perfectly proper.

For the reasons stated in this opinion, the judgment of the district court as to compensatory damages is vacated and the judgment as to punitive damages is affirmed and the cause is remanded for further proceedings in accordance with this opinion. The parties shall bear their respective costs on appeal. Because of the unusual posture of this case on remand, Circuit Rule 18 shall not be applicable but the case will remain with the same district court judge for such further proceedings as may be necessary.

---

8. An example of the exercise of discretion in excluding photographs, sustained on appeal, is set forth in *Hrabak v. Madison Gas and Electric Company*, 240 F.2d 472, 479 (7th Cir. 1957), the photographs in a personal injury case being of the plaintiff during the period when he was being treated for his injuries and the photographs showed his face distorted with pain.