Danny BIGGS, Plaintiff–Appellee,

v.

VILLAGE OF DUPO; Curtis Wiechert, Individually and as Mayor; Charles Binnion, Individually and as Trustee; I.D. Cleveland, Individually and as Trustee; Faith Ann Feltmeyer, Individually and as Trustee; and Marvin Stout, Individually and as Trustee, Defendants–Appellants.

No. 88–1995.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 24, 1989.

Decided Jan. 9, 1990.

Jack Carey (argued), Belleville, Ill., for plaintiff-appellee.

Robert Tucker (argued), Evans & Dixon, Edwardsville, Ill., for defendant-appellant.

Before CUDAHY and EASTERBROOK, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

On July 1, 1985, Danny Biggs was fired from his job as part-time police officer for the Village of Dupo, Illinois, on account of statements he made during an interview which had appeared in a local newspaper. Mr. Biggs filed suit under 42 U.S.C. § 1983 against the Village, its mayor and the four village trustees who voted to fire him, for violating his first amendment right to freedom of speech. The case was tried on January 27 and 28, 1988, and the jury returned a general verdict in favor of Mr. Biggs, awarding him $60,000 in compensatory damages. The court entered judgment accordingly, and awarded Mr. Biggs $16,525.00 in attorney's fees and $510.78 in expenses. On appeal, the defendants raise three issues: (1) whether the defendants violated Mr. Biggs' first amendment rights; (2) whether the evidence supported an instruction on damages for mental suffering or emotional distress; and (3) whether the district court's award of attorney's fees was excessive.

I. BACKGROUND

Mr. Biggs worked for the Village of Dupo as a part-time police officer for fourteen years. Dupo is a community of approximately 3,000 people, about eight miles south of East St. Louis, Illinois. In 1985, Dupo's police department had five full-time officers and four part-time police officers, including Mr. Biggs. Sergeant Norman Thompson was Mr. Biggs' immediate superior, and handled the scheduling of both full- and part-time officers. The police department was headed by Chief of Police Walter Ford, who was responsible to defendant Curtis Wiechert, the Village's Mayor and *ex officio* Police Commissioner. The Mayor was responsible to the Village's six-member Board of Trustees, whose bimonthly meetings he attended.

During the first half of 1985, a local weekly newspaper called the *Cahokia–Dupo Journal* planned a series of articles called "Meet Your Police," each article to feature an individual officer of the village police department. The chief of police approved the interviews upon which the "Meet Your Police" articles were to be based, and the interviews were scheduled through the department. By early June, the five full-time officers had been interviewed, and a reporter from the *Journal* interviewed Mr. Biggs. The record does not show whether the *Journal* published any other "Meet Your Police" articles, but on Wednesday, June 26, 1985, an article

based on Mr. Biggs' interview appeared. Mr. Biggs agrees that it accurately reflects what he said to the reporter during his interview. The emphasis given particular statements is apparently the paper's.

The article (the full text is in this opinion's appendix) opens with a quote from Mr. Biggs: "In the years that I've been here, it's been hard to distinguish the politicians from the criminals." The article's headline comes from this quote. Generously quoting Mr. Biggs, the article focusses on Mr. Biggs' complaint that the "politicians" of Dupo have hurt the Village police department with their "interference." According to Mr. Biggs, politics and the politicians, who have "always interfered," should be kept out of the department's affairs. While Mr. Biggs conceded that recently things had improved some, he complained that the department still lacked adequate funding for equipment and officers' salaries. The article also relates Mr. Biggs' impression that "the politicians have run most of the good people away" from the police department, including former Chief Carl Wolf, and that Mr. Biggs' own applications for full-time officer and for police chief were turned down.

The article made the Village officials unhappy. Following its publication, Mayor Wiechert told Sergeant Thompson to take Mr. Biggs off the police work schedule for that coming weekend. The next Monday, July 1, 1985, at a regularly scheduled meeting of the Village Board of Trustees, Mayor Wiechert recommended that the Board revoke Mr. Biggs' commission as part-time police officer, effective immediately. After discussion, a majority of the Board—defendants Charles Binnion, I.D. Cleveland, Faith Feltmeyer, and Marvin Stout—voted to revoke Mr. Biggs' commission. This lawsuit followed.

There was no dispute at trial over why Mr. Biggs was fired. Mayor Wiechert and the three Board members who testified all agreed that they were motivated to remove Mr. Biggs from the Village police force solely on account of the content of the "Meet Your Police" article. Although the officials seemed especially upset over the "it's hard to distinguish the politicians from the criminals" remark, they did not focus on any specific statements in the article as the impetus for their decision. Indeed, Trustee Feltmeyer said she was "offended" by Mr. Biggs' statements about inadequate police department funding and the poor condition of its police cars, that officers sometimes had to patrol in their private cars, and that the department had to ask the American Legion and VFW to donate radios for the police cars.

■ The defendants moved for directed verdict at the close of evidence, claiming Mr. Biggs' comments were unprotected by the First Amendment since they did not relate to a subject of public concern, and that even if they did, Mr. Biggs' interest in speaking out was outweighed by the Village's interest in promoting the efficiency of its police department. The district court denied the motion, finding that "the obvious purpose" of the "Meet Your Police" series "was to inform the public and educate the public about their police department," and that since the Village had approved the interview, it couldn't later claim that what Mr. Biggs had to say was of no interest to the public. Having "heard no testimony from anyone that this article did, in fact, interfere with the smooth operation of the [police] department," and finding that there was no potential for disrupting direct working relationships within the Village government since Mr. Biggs was "at the bottom of the ladder" of the department while his comments concerned people (either presently or formerly) at the top of village government, the court held as a matter of law that Mr. Biggs' statements were constitutionally protected, and so instructed the jury.[1] The court later denied the defendants' motion for judgment notwithstanding the verdict on essentially the same grounds, and denied a motion for new

---

1. The district court properly recognized that this question, although it may require predicate factual determinations, is one of law to be decided by the court, not the jury. See *Connick v. Myers*, 461 U.S. 138, 148 n. 7, 103 S.Ct. 1684, 1690 n. 7, 75 L.Ed.2d 708 (1983).

trial alleging various trial errors. The defendants now appeal.

## II. THE FIRST AMENDMENT

The Supreme Court has recognized two limitations—one of content and one of context—on the right of public employees to express themselves free from the threat of retaliation by their employers. "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). And, public employers may lawfully regulate employees' expression, even on matters of public concern, if "the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees" outweigh the "interests of the [speaker], as a citizen, in commenting on matters of public concern." *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). The defendants now renew their argument that Mr. Biggs' statements were not of public concern under *Connick*, and, even if they were, that the district court was mistaken in concluding that the balance of interests under *Pickering* favored Mr. Biggs.

### A.

■ At trial, the defendants did not claim to have fired Mr. Biggs on account of any specific comment or comments in the interview; rather, as Trustee Feltmeyer testified, they found the whole article offensive. On appeal, the defendants argue that the whole article was unprotected under *Connick* because any comments of public interest it contained were outweighed by the "knowingly false accusations and personal complaints which permeate[d] the interview." Brief of Appellant at 11. However, reading the article in its entirety, and giving the various comments their natural weight as they appear in the interview, it is plain that the interview Mr. Biggs gave concerned issues of interest to the public.

The article relates a number of comments which unquestionably are of public interest. Mr. Biggs reviewed his own background and qualifications as a police officer. (The Village must have thought at least this much was of interest, since it consented to the "Meet Your Police" series.) Mr. Biggs also criticized what he felt was the inadequate funding of the Village police department, its lack of equipment, the low pay of its officers relative to other city employees, the high turnover rate of officers, and what he believed to be the source of the problems—indifference and interference in the department's affairs by the Village's "politicians." Undoubtedly such issues, which go to the heart of the effectiveness of Dupo's police force and thus the security of its residents, are of public concern.

The defendants claim, though, that Mr. Biggs' interview was unprotected because it included his remark that "it's been hard to distinguish the politicians from the criminals." They argue that the assertion was defamatory and known by Biggs to be false. *Cf. Pickering*, 391 U.S. at 574 n. 6, 88 S.Ct. at 1738 n. 6. The remark, however, falls short of a statement that the persons in control of the village government had been involved in criminal conduct. Mr. Biggs admitted at trial he had no evidence to support such a charge.

The remark is of uncertain meaning. We think it must be read in the context of Mr. Biggs' complaints that the police department was underfunded and that the politicians were responsible for the lack of equipment, low pay, and high turnover rate. So read the statement suggests an opinion that those who tie the hands of the police department must share responsibility for damage to the community caused by criminals the police fail to apprehend.

Opinions, at least those concerning public figures and public affairs, cannot be libelous. "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend

for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974). See, *e.g., Quilici v. Second Amendment Foundation,* 769 F.2d 414, 418 (7th Cir.) *cert. denied,* 475 U.S. 1013, 106 S.Ct. 1192, 89 L.Ed.2d 307 (1985). The district court concluded that Mr. Biggs' remark was just his opinion.

As Judge Easterbrook explained in *Stevens v. Tillman,* 855 F.2d 394, 398 (7th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1339, 103 L.Ed.2d 809 (1989), "Every statement of opinion contains or implies some proposition of fact, just as every statement of fact has or implies an evaluative component." We are reluctant to read into Mr. Biggs' remark an implied charge of criminal conduct on the part of those referred to as "politicians."

We need not, however, reach a definitive view. We would necessarily face that question if defendants proved that they had discharged Mr. Biggs because of his "hard to distinguish" remark and would have reached the same decision even in the absence of his clearly protected speech concerning matters of public concern. *Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). They made no effort to establish that defense, nor did they seek an instruction submitting it to the jury.

■ The article also contains Mr. Biggs' complaints that his applications for promotion to full-time officer and Chief of Police had been denied, and that a former mayor of Dupo had accused him of "having a bad attitude." The First Amendment does not protect public employees' ordinary personnel disputes. *Connick,* 461 U.S. at 147–49, 103 S.Ct. at 1690–91; *Altman v. Hurst,* 734 F.2d 1240, 1244 (7th Cir.), *cert. denied,* 469 U.S. 982, 105 S.Ct. 385, 83 L.Ed.2d 320 (1984). However, whether an employee's speech raises matters of public concern must be determined by the "content, form, and context of a given statement, as revealed by the whole record."

*Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690–91; *Knapp v. Whitaker,* 757 F.2d 827, 839 (7th Cir.), *appeal dismissed and cert. denied,* 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985).

The interview does not become unprotected simply because it includes complaints personal to Mr. Biggs. The comments were made during an interview which covered various topics of public concern—a prearranged, departmentally-approved interview intended by the authorities to be publicized. Mr. Biggs' personal complaints are closely tied to his more general criticism of the Dupo officials' interference in the police department's affairs. The situation is similar to *Knapp v. Whitaker,* above, where a school teacher complained directly to the school board (in violation of district policy) that the school district's grievance procedure was not working properly. As a specific example of the problems, he related his own unsatisfactory experience with the grievance procedure. 757 F.2d at 833. While "the functioning of a grievance procedure is generally an internal issue," in *Knapp* it had become of public interest because a school board member and several administrators had openly sought comments from teachers on the procedure in order to facilitate ongoing collective bargaining between the teachers' union and the school district. Thus, we concluded that the teachers' complaints to the school board were protected speech, and went on to consider the balance of interests under *Pickering. Id.* at 842. Here, Mr. Biggs, like the teacher in *Knapp,* was using his personal disappointments to illustrate how "political" interference was hurting the Village police force. Just as a complaint "not otherwise of public concern does not attain that status because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest," [2] a communication on matters of public concern does not become unprotected because it contains remarks which would evidence a purely private dis-

---

**2.** *Connick,* 461 U.S. at 148 n. 8, 103 S.Ct. at 1691 n. 8. See also *Fiorillo v. U.S. Dept. of Justice,*

*Bureau of Prisons,* 795 F.2d 1544, 1550–51 (Fed. Cir.1986).

pute in a different setting. The district court was correct in finding that Mr. Biggs' comments were on a matter of public concern.

### B.

Even when speech concerns public issues, *Pickering* requires the court to strike a balance between the interests of the public employee in commenting on matters of public concern and that of the State, as an employer, in efficiently carrying out its public services. 391 U.S. at 568, 88 S.Ct. at 1734. The main interest of the speaker is self-evident: "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964). Also, while it is sometimes said that police officers' first amendment rights are more limited than that of others, freedom of speech is not traded for an officer's badge. Indeed, as the district court recognized, an additional interest favoring law enforcement officials' speech may be present. In *Pickering*, the Supreme Court recognized that "[t]eachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory discharge." 391 U.S. at 572, 88 S.Ct. at 1736.[3] Many of Mr. Biggs' comments criticizing the Dupo officials dealt with police department funding.

On the other side of the ledger, we have identified certain factors contained in the public employer's general interest in maintaining a work environment conducive to efficient provision of services: the need for confidentiality; the need to curtail conduct which impedes the employee's ability to perform his or her duties; the employer's need to maintain discipline and harmony among co-workers; and the need to encourage a close and personal relationship between the employee and his or her superiors, where that relationship calls for loyalty and confidence. *Conner v. Reinhard*, 847 F.2d 384, 389 (7th Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 147, 102 L.Ed.2d 118 (1988); *Egger v. Phillips*, 710 F.2d 292, 319 (7th Cir.) (*in banc*), *cert. denied*, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983); *Clark v. Holmes*, 474 F.2d 928, 931 (7th Cir.1972) (*per curiam*), *cert. denied*, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973). The defendants argue that the district court gave too little weight to the last two factors when it held that Mr. Biggs' speech was protected.

The district court concluded that the publication of Mr. Biggs' interview caused no significant disruption in the efficient operation of the Village police department. The only evidence of disruption was Mayor Wiechert's conclusory testimony that the article "caused a lot of disruption in the department," and that he "felt that something had to be done to maintain the morale and support of the officers so that they could work together." However, his claim to have met and discussed the department's morale with then-Chief Ford prior to the July 1, 1985 Board of Trustees meeting was put in doubt by Chief Ford, who said he could remember no such meeting. Neither Sergeant Thompson, Mr. Biggs' immediate supervisor, nor Chief Ford, both of whom testified at trial, mentioned any dissension whatsoever within the Police Department as a result of the article. The cases cited by the defendants in arguing that the district court erred all contain substantial evidence of actual disruption caused by the expression in question. See *Sprague v. Fitzpatrick*, 546 F.2d 560, 565 (3d Cir.1976), *cert. denied*, 431 U.S. 937, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977) (assistant district attorney's public accusation that his immediate supervisor had lied "totally

---

3. See also *Clary v. Irvin*, 501 F.Supp. 706, 709 (E.D.Tex.1980) ("[T]here is an additional interest to be considered: that of the plaintiffs, as peace officers and members of the Crockett Police Department, in communicating their disquietudes and professional concerns about its chief official to those possessed of the power to remedy the disturbing matters. As providers of a public service, the officers had the prerogative, even the duty, to comment on the quality of that service when trying to improve it." (footnote omitted)).

precluded any future relationship between him and the defendant"); *Egger,* 710 F.2d at 321 (evidence of rumors, alleged threats, discord in the office and mutual distrust between the FBI agent plaintiff and others); *Foster v. Ripley,* 645 F.2d 1142, 1149 (D.C.Cir.1981) (direct attack on superior completely disrupted plaintiff's working relationships and effectiveness).

Nor did Mr. Biggs' speech pose any threat to relationships requiring loyalty or confidence. While the article undoubtedly upset the Board and the Mayor, such "nominal superiors" (as the court characterized them) are not immune to criticism from employees. See *Pickering,* 391 U.S. at 568–70, 88 S.Ct. at 1734–35. Mr. Biggs did not criticize his fellow officers, his supervisors in the Village of Dupo Police Department, nor the current Police Commissioner; he was "on the bottom rung" while the "politicians" he was criticizing were at the top. Thus, unlike *Egger,* above, this case does not involve "the dangers inherent when law enforcement officials mistrust one another." 710 F.2d at 319. There was no evidence that the Mayor had any personal involvement in law enforcement other than his brief daily meetings with the Police Chief (although the Mayor technically had the power under the Village Code to make arrests). While Mr. Biggs personally knew each member of the Board of Trustees (not surprising in a small town), there was no evidence of any working relationship, let alone one calling for loyalty and confidence, between the Board and him. The district court was correct in holding that Mr. Biggs' statements to the paper were protected by the First Amendment, and that the Village violated his constitutional rights by firing him for having made them.

### III. MENTAL DISTRESS

 Over the defendants' objection, the district court instructed the jury to include in its damage award compensation for "mental suffering or emotional distress experienced as a result of the termination." The jury, which was also instructed to include "the value of salaries lost and the present cash value of the salaries reasonably certain to be lost in the future," returned a general verdict in favor of Mr. Biggs for $60,000. We agree with the defendants that there was insufficient evidence to support the instruction on damage for mental distress.[4]

 Direct evidence of Mr. Biggs' emotional distress was sparse. Mr. Biggs testified that he was affected emotionally by being fired, and that he was concerned over "the idea of my family going through it." When he tried to explain how his family was affected, defense counsel's general objection was sustained without explanation. Mr. Biggs' lawyer made no offer of proof, and no other direct testimony concerning mental distress was introduced.

We appreciate that it can be hard to articulate emotional upset caused by treatment considered to be unfair, but as we have recently cautioned, "when the injured party provides the sole evidence [of mental distress], he must reasonably and sufficiently explain the circumstances of his injury and not resort to mere conclusory statements." *Rakovich v. Wade,* 819 F.2d 1393, 1399 n. 6 (7th Cir.1987), *vacated on reh. in banc on other grounds,* 850 F.2d 1180, *cert. denied,* —— U.S. ——, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988). In *Nekolny v. Painter,* 653 F.2d 1164, 1172–73 (7th Cir. 1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982), we reversed awards of damages for emotional harm,

---

**4.** During the instruction conference, the district judge recognized that the defendants' argument had some merit. Faced with a colorable objection to an instruction on an element of damages, it would have been prudent to give the jury a special verdict form which separated out the different elements. This avoids the necessity of a retrial on damages should it later be decided, by the district court on post-verdict motion or by the court of appeals, that an award of those damages cannot be sustained. Mr. Biggs suggests that because the defendants did not request such a verdict form, they have lost their right to raise this issue on appeal. We are unable to find, however, any authority which holds that failure to suggest using special verdicts, rather than the failure to object to an instruction or to object to the omission of an issue when special verdicts are used, constitutes waiver. See Fed.R.Civ.P. 49(a) and 51.

stating that "[a] single statement by a party that he was 'depressed,' 'a little despondent,' or even 'completely humiliated' (the latter in the context of explaining why other employment was not sought), is not enough to establish injury even when the statement is considered along with the facts of this case."

While Mr. Biggs emphasizes that, unlike the plaintiffs in *Nekolny*, he was told wrongly that he had acted in a way "unbecoming a police officer," and that the Mayor reportedly said Mr. Biggs was unworthy to represent the Village of Dupo, we require that a plaintiff show *"demonstrable emotional distress,"* not just point to circumstances of the constitutional violation which might support an inference of such injury. *Rakovich,* 819 F.2d at 1399 (emphasis in original). Mr. Biggs' testimony was as conclusory as that held insufficient in *Nekolny,* and so could not properly support the instruction on damages for emotional distress given by the district court. Accordingly, defendants are entitled to a new trial on damages unless we can determine an appropriate remittitur, and Mr. Biggs so elects.

Plaintiff proved his total earnings as a part-time officer in each of the four full years before his discharge. His counsel asked the jury to award the average of these amounts, multiplied by 14. This figure would have been $53,088. Defendants' counsel, in response, argued only that Mr. Biggs had been called upon to perform an unusual amount of work in 1983, and that the larger earnings that year were unrepresentative. The theory for using 14 as a multiplier was not really explained, but defense counsel took no exception to it. Averaging the other three years results in an annual figure of $2145. Multiplying by 14 produces $30,030. It can fairly be said that defendants do not dispute this figure. Therefore, a remittitur of $29,970 at Mr. Biggs' option is appropriate. See *Durant v. Surety Homes Corp.,* 582 F.2d 1081, 1085–86 (7th Cir.1978); *Williamson v. Handy Button Machine Co.,* 817 F.2d 1290, 1297–99 (7th Cir.1987).

## IV. ATTORNEY'S FEES

The district court awarded Mr. Biggs $16,525 in attorney's fees, representing 165.25 hours of work at $100 an hour. In a written order granting the fees, the district court fully explained the reasoning supporting its award, finding that the number of hours spent on the case was reasonable in light of the difficulty of the facts and the law involved, and that the "modest hourly rate" properly reflected Mr. Biggs' attorney's lack of familiarity with civil rights litigation. While he granted Mr. Biggs' attorney's fee request, Judge Beatty denied a requested enhancement for risk, since he believed the chances of losing the case to be minimal. The defendants' unsupported assertion that the award is excessive fails to persuade us that the district court abused its discretion in any way.

Insofar as the judgment determined defendants' liability to Mr. Biggs, it is affirmed. Insofar as it awarded recovery of $60,000 it is vacated and the case remanded for a new trial on the issue of damages, unless within ten days from the return of our mandate, Mr. Biggs elects a remittitur of $29,970, in which case judgment shall be entered for $30,030 damages, $510.78 in expenses, and $16,525 in attorney's fees. Interest shall run from the date of the original judgment. Plaintiff is awarded half his costs on appeal, and should submit along with his bill of costs a comprehensive statement of reasonable legal fees incurred in defending this appeal. Defendants will have ten days thereafter to submit any objections to the claimed fees.

## APPENDIX

CAHOKIA–DUPO JOURNAL—June 26, 1985

It's hard to tell politicians from criminals, Biggs says

Meet your police

By MIKE ANTHONY
*Of the Journal Staff*

DUPO—"In the years that I've been here, it's been hard to distinguish the politicians from the criminals," says Danny Biggs of the Dupo Police Department.

A part-time officer, the 37–year–old Biggs joined the force nearly 14 years ago.

"I was the youngest policeman they ever hired," he said.

During his tenure with the department, Biggs has served under five police chiefs, six police commissioners and he has seen about 30 officers come and go.

"I've just about seen it all," he said.

Biggs, who admits to being "very outspoken," charged that politics have interfered with the growth of the department.

"Keep the politics out of it," he said of the department. "They've always interfered, always."

Politicians have dictated "what should be done instead of leaving it up to the chief," he said.

"This police department has always had to fight for everything we have. Funding is the biggest problem the department has faced."

Politics have accounted for lack of equipment, low pay and a high turnover rate of officers, he charged.

The officer said he has been characterized in the past as having "a bad attitude," but he attributed that to being unwilling to "play the game of politics."

"It seems to me when people become politicians, their whole attitude changes. To me, the police department is a necessity. They got to have us," he said.

Of the majority of politicians he's seen over the years, Biggs said, "They graduated from that school where you talk out of both sides of your mouth."

In the past, some police commissioners have not taken an active interest in the department, he charged.

"Some of the guys they had, they'd tell you one thing and turn around and do something else. They were glorified by

the fact they were police commissioner," he said.

The police commissioner now is Charles Brimm,[5] whom Biggs said was a former Dupo police officer and a St. Clair County sheriff's deputy. Because of Brimm's past involvement with law enforcement, he is more attuned to the problems the department faces, Biggs said.

"We recently got a new car and the new red lights," items that have been needed for a long time, he said.

Recently, Biggs said both of the department's squad cars broke down and "two officers drove their own cars on calls."

One of the squad cars has about 95,000 miles on it, while the other has about 84,000 miles, the officer said.

"It seems the only time we get new cars in during an election year," he charged.

Lack of equipment always has been a problem the department has faced, Biggs said.

"Several radios were donated by the American Legion and the VFW because the village said they didn't have the money," he charged. "The stuff I have, I bought myself."

Biggs said he has paid for items such as guns, handcuffs and other accessories out of his own pocket. But, he said, the village did pay for a new gunbelt.

At one time, a board member offered to donate his salary to the department, but "the mayor (at that time) wouldn't go along with it." The officer also said he was critical about the pay for officers. As a part-time officer, Biggs said he started with a salary of $2 an hour. The biggest raise he ever received was $1.50 an hour.

He also said there was a discrepancy in the salaries paid to some village employees and members of the Police Department. Some village employees belong to a union.

**5.** The *Cahokia–Dupo Journal* apparently was mistaken as to Mr. Brimm's title; Mayor Wiechert testified that Charles Brimm was Commissioner of Public Safety, not Police Commissioner, and that the Mayor was *ex officio* Police Commissioner. His testimony was confirmed by both former Mayor Virgin Casey, and the Village of Dupo Code in evidence. Transcript at 34, 128–29; Village of Dupo, Ill., Code § 2.37. The record does not explain the scope of the Commissioner of Public Safety's authority.

"They deal with the city workers first, then you get what's left," he charged. "They make more than the police officers do. If they would deal with a union (for the Police Department), they wouldn't run over you like they do.

"I don't blame the city workers. It doesn't have any reflection on them."

Police officers "have been secondary ever since I've been here," he said.

In recent years, the department has become more professional, "but the politicians have run most of the good people away," he said. "We've got some good policemen now, but most of them left."

Biggs has applied for positions as a full-time officer and as the police chief when the positions were vacant, but has been turned down for the jobs.

When he applied for the full-time officer's job, Biggs alleged he was turned down because of "a personal thing against me ... they wanted to send the man to the (police) academy."

And, he charged, "A former mayor accused me of having a bad attitude."

When he applied for the police chief's position, Biggs said he was turned down because he couldn't meet the village's law enforcement educational requirements for the job. That criteria is unfair, he charged.

"They can send you to all kinds of school, but 90 percent of it is street learning," he said.

He also alleged that he wasn't notified that he was turned down for the job— "they didn't have the guts to call. They didn't want somebody outspoken."

Biggs said, "I'm very outspoken. I've always been like that. I guess I got that from (Carl) Wolf, he was too."

Wolf was a former police chief of the department, and Biggs said, "He was the most intelligent chief we had. He was smarter than the politicians. When Carl made a move or a decision, he knew it was the right way. He knew all the aspects about the law."

"Carl was the smartest they ever had" in dealing with the politicians, Biggs said. Wolf left the department to become the Highland police chief and Biggs charged, "The politicians run Carl off."

Funding was a problem when Wolf was police chief, remains a problem and will continue to be a problem, Biggs said.

"The Police Department always hears (village officials say) we don't have enough money. There's no way the Police Department can support itself unless they arrest every (expletive deleted) in town," he said. "The only way this department can support itself is through traffic tickets."

Because Interstate 255 has routed away most of the traffic which used to travel through Dupo on Route 3, the number of traffic tickets written has declined.

Despite his complaints about his job, Biggs said, "I do enjoy the job, sometimes."

A life-long Dupo resident, Biggs worked for the Missouri–Pacific Railroad until 1981, when he was laid off. He occasionally works for the railroad now, "but not very often." Biggs also is the chief of the Dupo Volunteer Fire Department.

He and his wife Beverly have three children—Dawn, Danielle and Justin—and have been married for 18 years.

Biggs reiterated that the Police Department is a necessity for the village.

"They never did care about it, even though they realize that they have to have it," he said of village officials.