UNITED STATES of America, Plaintiff–Appellee, Cross–Appellant,

v.

Joseph P. BALISTRIERI and Angelina J. Hurdelbrink, Defendants–Appellants, Cross–Appellees.

Nos. 91–2379, 91–2493.

United States Court of Appeals, Seventh Circuit.

Argued April 14, 1992.

Decided Nov. 24, 1992.

Rehearing Denied Jan. 20, 1993.

John R. Dunne, David K. Flynn, Asst. Attys. Gen., Mark L. Gross (argued), Dept. of Justice, Civil Rights Div., Appellate Section, Clay G. Guthridge, Joan A. Magagna, Barbara Kammerman, Dept. of Justice, Civil Rights Div., Housing Section, Washington, DC, for U.S.

Joseph P. Balistrieri, pro se.

Ronald J. Steinle, Jr., Milwaukee, WI, argued for Angelina J. Hurdelbrink.

Before RIPPLE and MANION, Circuit Judges, and WILL, Senior District Judge.*

* Hon. Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by

MANION, Circuit Judge.

The United States sued Joseph Balistrieri, owner of the Shorecrest Apartments in Milwaukee, and Angelina Hurdelbrink, his rental agent, alleging that Balistrieri and Hurdelbrink committed discriminatory rental practices in violation of the Fair Housing Act, 42 U.S.C. §§ 3601–19. A jury found for the government and awarded damages to several aggrieved individuals and to a Milwaukee fair housing organization, the Metropolitan Milwaukee Fair Housing Council (MMFHC). The district court subsequently imposed an injunction on Balistrieri and imposed civil penalties on him and Hurdelbrink. Balistrieri and Hurdelbrink appeal, raising a plethora of issues regarding liability, damages, and the propriety of injunctive relief; the government cross-appeals the district court's decisions not to allow it to seek damages for two other people and to remove the issue of punitive damages from the jury. We affirm in part and reverse in part.

I.

"Testing" is a method used by organizations such as the MMFHC to ferret out discriminatory housing practices. In conducting a test, the MMFHC sends two people posing as customers, one white and one black, to a realtor, home, or apartment complex. The two people would be as close to identical in distinguishing characteristics other than race—for example, age and marital status—as possible. The two would inquire about the identical type of housing. Differences in response to the two testers—for example, quoting higher prices to a black, or giving the two testers different stories about the availability of an apartment—could indicate discrimination.

The MMFHC decided to perform a test at the Shorecrest Apartments. The test was not prompted by any complaints about discrimination but rather was intended to provide a new tester the opportunity to conduct a test. Carla Herbig, the new tester, who is black, went to the Shorecrest at about 5:30 p.m. on April 25, 1989, and met with Hurdelbrink. After Herbig told Hur-

delbrink she was interested in a one-bedroom apartment for May or June, Hurdelbrink showed her apartment 321 and told her the rent was $500 per month. Hurdelbrink did not show Herbig any other facilities in the building.

The next day, Kate Lonsdorf, who is white, visited the Shorecrest. Like Herbig, Lonsdorf told Hurdelbrink she was interested in a one-bedroom apartment for May or June. Hurdelbrink showed Lonsdorf the same apartment she showed Herbig, but told her the rent was $480 per month. Hurdelbrink also showed Lonsdorf the building's storage and laundry facilities and told Lonsdorf about the building's restaurant.

After reviewing the results of this test, Carla Wertheim, MMFHC's associate director, suspected discrimination and decided that more tests would be appropriate. Thus, on April 29, Kim Davis, who is black, visited the Shorecrest and told Hurdelbrink she wanted a two-bedroom apartment. Hurdelbrink responded that no two-bedroom apartments were available. However, Hurdelbrink did show Davis a three-bedroom apartment and told her the rent was $850 per month. Hurdelbrink also told Davis that she might have some two-bedroom apartments after June, for which the rent would be $850 per month.

About one hour after Davis left, Lynn Connolly, a white tester, arrived at the Shorecrest. Connolly, like Davis, told Hurdelbrink that she was looking for a two-bedroom apartment. Hurdelbrink told Connolly that no two-bedroom apartments were currently available. However, Hurdelbrink did show Connolly an office that was to be converted into a two-bedroom apartment that would be available June 1 for $700 per month. Hurdelbrink also showed Connolly a vacant three-bedroom apartment and told Connolly that the apartment could be converted to a two-bedroom apartment which would rent for $875 per month. When Connolly asked about an application, Hurdelbrink gave her one.

designation.

On May 5, Carol Cunningham, who is white, met with Hurdelbrink at the Shorecrest and told Hurdelbrink she was interested in a one- or two-bedroom unit. Hurdelbrink showed Cunningham a two-bedroom unit on the eighth floor with a quoted rent of $850 per month, a one-bedroom apartment on the second floor with a quoted rent of $475 per month, and a one-bedroom apartment (with no rent quoted) on the third floor, apartment 321. Hurdelbrink also told Cunningham that two other one-bedroom apartments were available.

The next day, Sheryl Sims–Daniels, who is black, visited the Shorecrest. She told Hurdelbrink she was interested in one- and two-bedroom apartments. Hurdelbrink showed Sims–Daniels apartment 801, a two-bedroom, and told her the rent was $875 per month. Hurdelbrink also showed her apartment 321 and told her the rent was $525 per month. Hurdelbrink did not show Sims–Daniels any other apartments. When Sims–Daniels asked to fill out an application, Hurdelbrink told her she could not because of uncertainty about any apartments being available at the time.

MMFHC conducted two more tests. For the fourth test, Barry Zalben, who is white, met with Hurdelbrink at the Shorecrest on May 11, 1989, and asked about one- and two-bedroom apartments. Hurdelbrink showed him apartment 801, a two-bedroom apartment, and told him the rent was $875 per month. Hurdelbrink also showed Zalben two one-bedroom apartments; apartment 615, for which she told him the rent was $500 per month, and apartment 308, for which she told him the rent was $475 per month. Hurdelbrink told Zalben that all three apartments would be available sometime between June 1 and June 4. Hurdelbrink called Zalben on May 17, but he did not return her call.

Greg Thompson, who is black, spoke with Hurdelbrink at the Shorecrest about one hour after Zalben. Thompson asked to see one- and two-bedroom apartments and told Hurdelbrink that he would like to move in as soon as possible. Hurdelbrink only showed Thompson apartment 615 and told him the monthly rent was $525. Hurdelbrink brought him up to apartment 801 but did not take him inside; she told him the rent was $875 per month. Hurdelbrink told Thompson that both apartments would be available in July. But a white man named Walter Cain (who was not a tester) ended up renting apartment 615 on May 20, paying $500 per month rent. Thompson asked to fill out an application, but Hurdelbrink told him he could not do so until he put down a deposit.

On the final test, Carl Hubbard, who is black, met Hurdelbrink at the Shorecrest on June 5. Hubbard asked to see one- and two-bedroom apartments; Hurdelbrink, claiming that she could not show him any two-bedroom apartments, showed him only one one-bedroom apartment. She told Thompson the rent for that apartment was $525 per month. She did not say when the apartment would be available, told Thompson his name could be placed on a waiting list, and told him also that he could fill out an application only when he was ready to rent. Hurdelbrink asked Hubbard several times about his "creditworthiness" although Hubbard assured her that his credit was fine.

Ed Valent, a white tester, met with Hurdelbrink at the Shorecrest about two hours after Hubbard. Valent told Hurdelbrink that he was interested in one- and two-bedroom apartments, and Hurdelbrink showed him apartment 204, which she told him would be available on June 15 for a rent of $475 per month. She had previously told him over the phone about two other two-bedroom apartments that would become available later. At the Shorecrest, Hurdelbrink told Valent that he could move into a one-bedroom apartment and then move into a two-bedroom apartment when one became available. When Valent asked for an application, Hurdelbrink gave him one.

Besides the testers, two other witnesses testified about their experiences attempting to rent at the Shorecrest during the spring of 1989. Marva Pattillo, who is black, met with Hurdelbrink at the Shorecrest on May 6 and asked about a two-bedroom apartment. Hurdelbrink showed

Pattillo an eighth-floor apartment with a lake view. Pattillo told Hurdelbrink she loved the apartment and was "definitely interested" in it, and asked Hurdelbrink what the rent was. Hurdelbrink said she did not know the rent offhand but would find out. Hurdelbrink called Pattillo several days later and told her the rent was $850 per month. When Pattillo returned to the Shorecrest on May 13 to see the apartment again, she told Hurdelbrink that she liked it and would need only a day or two to make her plans final. On May 15, Pattillo called Hurdelbrink to say that she would take the apartment. Hurdelbrink was not in, so Pattillo left a message. Over the next week to ten days, Pattillo called Hurdelbrink often at both the Shorecrest and at home, and left numerous messages at the Shorecrest. But Pattillo's effort was in vain; when she finally reached Hurdelbrink, Hurdelbrink told her the apartment had been rented. Hurdelbrink did show Pattillo another available apartment. But that apartment was smaller, in a state of some disrepair, and did not have as good a view. Pattillo eventually moved into an apartment in another building.

Maureen Wahl, who is white, was also looking for an apartment at about the same time Pattillo was. Wahl first visited the Shorecrest in mid-April. Hurdelbrink showed her some apartments, but she did not like what she saw. Wahl left Hurdelbrink her card and told Hurdelbrink to call when something else became available. Hurdelbrink called about a week later to say a larger apartment was available. Wahl met Hurdelbrink at the Shorecrest during the first week of May and looked at apartment 801, a large apartment with a "spectacular" (in Wahl's words) view of Lake Michigan.[1] Wahl liked the apartment immediately. She told Hurdelbrink she would take it, but did not fill out an application or leave a deposit.

Hurdelbrink called Wahl about two weeks later to tell Wahl that other people were interested in apartment 801, and to ask Wahl if she was sure she wanted the apartment. Wahl said she did want the apartment. Sometime later, she followed up those words by mailing a check for July rent to Hurdelbrink. The record does not say exactly when Wahl sent the check; however, the check was dated May 29, so it is fair to infer that Wahl sent it near that date, which was after Hurdelbrink had told Pattillo the apartment had been rented. Wahl did not fill out an application or credit check form although the defendants testified that a completed application and successful credit check were part of their standard operating procedure before renting an apartment. Wahl did not sign a lease until August and did not move into the apartment until September.

The jury found that Hurdelbrink and Balistrieri had violated the Fair Housing Act by intentionally engaging in a pattern or practice of discrimination. Although none of the testers suffered any monetary loss, the jury awarded each tester $2,000 as compensation for the emotional distress they said they suffered upon finding out they had been discriminated against. The jury also awarded $5,000 to the MMFHC. The jury awarded no damages to Pattillo because the court had ruled before trial that the government could not seek damages for Pattillo or Kim Williams, another black person against whom the government alleged the defendants had discriminated. In fact, the court barred the government from presenting any evidence regarding Williams at all.

After a post-trial hearing before the court, the court enjoined Balistrieri from further discriminatory rental practices and ordered him to prepare a plan to establish nondiscriminatory rental procedures and ensure that all Shorecrest employees understood their obligations under the Fair Housing Act. The court did not enter an injunction against Hurdelbrink because by

---

1. Although Pattillo did not remember the number of the eighth-floor apartment she viewed, the government states that it was apartment 801. The defendants do not argue that Pattillo and Wahl did not view the same apartment, and the description of what Pattillo and Wahl saw—a large apartment on the eighth floor with a very good view of the lake—supports the inference that both viewed the same apartment.

the time of the hearing she had resigned her position at the Shorecrest. The court did, however, impose civil penalties of $100 against Hurdelbrink and $2,500 against Balistrieri.

## II.

The Fair Housing Act prohibits various forms of discrimination in the sale or rental of housing. Specifically, 42 U.S.C. § 3604 makes it unlawful

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race....

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race....

\* \* \* \* \* \*

(d) To represent to any person because of race ... that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

Section 3614(a) provides that the Attorney General may bring a civil action to enforce the Fair Housing Act whenever he "has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full and equal enjoyment of the rights secured by [the Act] or that any group of persons has been denied any of the rights granted by this subchapter and such denial raises an issue of general public importance...." In an action brought by the government, "the court" may "award ... preventative relief, including a permanent or temporary injunction," § 3614(d)(1)(A); "award such other relief as the court deems appropriate, including monetary damages to persons aggrieved," § 3614(d)(1)(B); and "assess a civil penalty against the respondent," § 3614(d)(1)(C).

■ As we have mentioned several times, this case was tried to a jury. The government demanded a jury trial in its complaint; the defendants moved to strike this demand. The defendants seize on § 3614(d)'s reference to "the court" to argue that the district court erred by refusing to strike the government's jury demand. This textual argument does not take the defendants far. In *Curtis v. Loether*, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974), the Court held that a private party in an action under § 3612, which authorizes "the court" to grant damages, is entitled to a jury trial.

The seventh amendment provides that "in suits at common law ... the right to trial by jury shall be preserved." This has been interpreted to mean that the right to a jury trial exists in suits to determine legal rights, as opposed to equity or admiralty suits. *Curtis*, 415 U.S. at 193, 94 S.Ct. at 1007 (citing *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 446–47, 7 L.Ed. 732 (1830)). This includes legal rights created by Congressional enactment. *Id.*

■ The question in this case, then, is not whether § 3614(d)'s reference to "the court" indicates that a judge rather than a jury is to be the decisionmaker in a § 3614 action. The question, instead, is whether the government has the right to make a jury demand. The defendants, however, did not argue in their briefs that the seventh amendment's preservation of the right to trial by jury does not apply to the government. Therefore, they have waived that argument. See *Reynolds v. East Dyer Dev. Co.*, 882 F.2d 1249, 1253 n. 2 (7th Cir.1989).

■ The defendants do argue that the government was not entitled to a jury trial because its suit was an equitable action for which no right to a jury trial exists. But § 3614(d) provides that the court may award "monetary damages to persons aggrieved." The government sought monetary damages to compensate the testers for the emotional distress they allegedly suffered as a result of the defendants' discrimination. The government's action was essentially a tort action for damages, for which the seventh amendment entitles a party to a jury trial. See *Curtis*, 415 U.S. at 195–96, 94 S.Ct. at 1009.

■ But the defendants perceive another hurdle. They argue that § 3614(d), despite its apparently plain language, does not allow the government to seek compensatory damages for an aggrieved party unless that party intervenes. Section 3614(d) was added to the Fair Housing Act in 1988. Before that amendment, the Act allowed the government in a pattern or practice case to seek only "preventive relief," which the courts held to include only equitable relief. See *United States v. Mitchell,* 580 F.2d 789, 792–93 (5th Cir.1978); *United States v. Long,* 537 F.2d 1151, 1152–55 (4th Cir.1976). Both before and after 1988, the Act allowed suits by private parties in which those parties could recover "actual and ... punitive damages." Compare 42 U.S.C.A. § 3612(c) (1977) with 42 U.S.C.A. § 3613(c)(1) (Supp.1992). Those "actual damages" included compensatory damages for injuries such as emotional distress. See *Curtis,* 415 U.S. at 195–96, 94 S.Ct. at 1009; *Long,* 537 F.2d at 1154.

According to the defendants, if Congress, against the statutory and caselaw background that existed in 1988, had wanted to provide for compensatory damages in suits by the Attorney General, it would have used the term "actual and punitive damages," a term the courts had already found authorizes an award of compensatory damages. Instead, Congress chose a different term, "monetary damages." This, say the defendants, shows that "monetary damages" does not include compensatory damages. Instead, it includes only monetary equitable relief such as restitution.

The government counters this with legislative history showing that when Congress amended the Fair Housing Act in 1988 to allow the Attorney General to seek monetary damages for aggrieved persons, it intended to allow courts to award relief "to all persons affected by the discriminatory housing practice" so as to avoid duplicative litigation. The defendants fire back that § 3614(e), also added in 1988, addresses this concern. That section provides that private parties may intervene in suits brought by the Attorney General, and that the court may grant such relief to the intervening party that is authorized by § 3613 (which explicitly includes "actual and punitive damages"). Allowing intervention avoids duplicative litigation, and the express reference to § 3613 allows the court to grant full relief to an aggrieved party who intervenes.

■ The defendants' argument is interesting, but we agree with the government that § 3614(d) allows the government to seek compensatory damages for an aggrieved person without that person's intervention. The Act before 1988 had already been interpreted to allow the Attorney General to seek equitable restitution. See *Long,* 537 F.2d at 1155. Why amend the Act to allow the Attorney General to recover something the Act already allowed him to recover? More important, despite the defendants' argument we think § 3614 is clear on its face. Congress in § 3614(d)(2) did not provide for the recovery of "restitution" or "equitable monetary relief"; it provided for the recovery of "monetary damages." The word "damages" has a commonly understood meaning: it generally connotes payment in money for a plaintiff's losses caused by a defendant's breach of duty, and is something different from equitable restitution. See *Rogers v. Loether,* 467 F.2d 1110, 1121–22 (7th Cir.1972); cf. *Long,* 537 F.2d at 1155 (distinguishing "general monetary damages" from equitable remedies such as restitution); see also Black's Law Dictionary, 351–52 (1979). Moreover, nothing in § 3614 expressly requires an aggrieved party to intervene before the court may award damages in a case brought by the Attorney General. This does not, as the defendants suggest, render § 3614(e) superfluous. That section simply provides a means for aggrieved parties to protect their own interests in pattern or practice cases if they believe the Attorney General will not sufficiently protect those interests.

■ So, despite the failure of any aggrieved party to intervene, this case involved an action for compensatory damages, for which a jury trial is proper. Having determined that, we move on to the

defendants' next argument, which is that the evidence was insufficient to support the jury's finding that they engaged in a pattern or practice of Housing Act violations. They first argue that because none of the testers were actually seeking apartments, there was no Fair Housing Act violation. That is incorrect. In *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), the Supreme Court held that falsely informing testers that apartments are unavailable violates § 3604(d), which makes it illegal to misinform "any person" about the availability of housing. *Id.* at 373, 102 S.Ct. at 1121; see also *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir.1990). Unlike § 3604(a), § 3604(d) does not require a bona fide offer; instead, § 3604(d) creates an enforceable right to truthful information for any person, not just bona fide apartment seekers. *Havens*, 455 U.S. at 373–74, 102 S.Ct. at 1121. This logic also extends to § 3604(b), which prohibits discrimination against "any person" in the terms or conditions of rentals and, like § 3604(d), does not require a bona fide offer. Therefore, offering black testers apartments at higher rental rates than those offered to white testers discriminates in the terms of rentals and violates the Act.

 The defendants also argue that even if the Act did not require that the testers be bona fide applicants, the evidence was insufficient to show that they treated the black testers less favorably than the white testers. We disagree. Five sets of testers testified in this case. In each test, the black person was treated less favorably: he or she was either shown fewer apartments, quoted higher rents, or quoted later dates of availability; in some cases, all those occurred on the same test. Moreover, based on the testimony of Pattillo and Wahl, the jury could reasonably infer that Hurdelbrink made special efforts to rent to Wahl, a white person—going so far as to dispense with the usual require-

ments of a completed application and a credit check—to avoid renting to Pattillo, who was black. Thus the evidence showed that (at least in those cases) Hurdelbrink consistently treated the black apartment seekers somewhat less favorably than the white apartment seekers. Based on this evidence, the jury could conclude Hurdelbrink's treatment of the black testers violated the Fair Housing Act's prohibitions against racial discrimination in the terms or conditions for housing rental and against racially-motivated misrepresentations about housing availability.

 The government, however, had to prove more than the fact that the defendants discriminated against several people. Section 3614(a) empowers the Attorney General to sue if he has cause to believe that a "pattern or practice" of violations exists. Proof of isolated or sporadic acts of discrimination does not suffice to prove a pattern or practice. Rather, the government must present evidence from which the fact-finder can reasonably conclude "'that ... discrimination was the [defendants'] standard operating procedure—the regular rather than the unusual practice.'" *King v. General Electric Co.*, 960 F.2d 617, 623 (7th Cir.1992); *United States v. DiMucci*, 879 F.2d 1488, 1497 n. 11 (7th Cir.1989) (both quoting *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977)).[2]

Was the evidence here sufficient for the jury to conclude reasonably that discrimination was the defendants' "regular practice"? Based on similar evidence, we upheld a finding of a pattern of discrimination in *DiMucci*. In that case, the government proved six incidents in which black apartment seekers or testers were treated less favorably than their white counterparts. See 879 F.2d at 1492 & nn. 6–7. We held this showing was sufficient to establish a pattern or practice, commenting that

---

2. *DiMucci* was a Fair Housing Act case; *Teamsters* was a Title VII case; and *King* was an ADEA case. As *DiMucci* shows, the holdings of cases like *Teamsters* and *King* are relevant to the meaning of "pattern or practice" in a hous-

ing discrimination case. "Pattern or practice" is not "a term of art, but appears in several federal statutes, and is interpreted consistently therein." *DiMucci*, 879 F.2d at 1497 n. 11.

"courts have granted relief based on fewer incidents than these." *Id.* at 1499 (citing *United States v. Pelzer Realty Co.,* 484 F.2d 438 (5th Cir.1973)). As in *DiMucci,* the government here has shown that over a relatively brief period (a little more than a month) five black testers and Marva Pattillo visited the Shorecrest. In *each* case, the blacks were treated less favorably than their white counterparts, all being offered less favorable terms and, except in one instance, being shown fewer apartments. As in *DiMucci,* a jury could reasonably infer that this was more than "isolated or 'accidental' or sporadic." *Teamsters,* 431 U.S. at 336, 97 S.Ct. at 1855.

■ *King,* which was decided after this case was briefed, could be read to indicate that the evidence here was not sufficient to support a finding of a pattern of discrimination. In *King,* we held that evidence of age discrimination against eleven employees at a GE plant in 1983 and 1984, and six employees in 1985, was not sufficient to show that a pattern of discrimination existed at GE during those periods. See 960 F.2d at 619, 626–627. However, a finding of pattern is a factual finding, and each case must stand on its own facts. Eleven instances of discrimination over two years, or six over one year at a large factory may very well be sporadic; but a jury may reasonably infer that when a defendant who in six chances over the course of little more than a month consistently discriminates, the discrimination is more than a sporadic occurrence. Moreover, *King* did not cite *DiMucci,* much less purport to overrule it. *DiMucci,* which is therefore still good law, requires the conclusion that the evidence in this case was sufficient to support a finding of a pattern of discrimination.

■ Balistrieri argues that even if the evidence is sufficient to show Hurdelbrink discriminated, there is no evidence to link her discrimination to him. However, the record contains testimony that Balistrieri was in charge of the Shorecrest, that Hurdelbrink and every other Shorecrest employee reported to him, that he had the final say concerning rents and rental prac-tices, and that he was almost constantly present at the Shorecrest. We agree with the government that the jury could reasonably conclude from Balistrieri's presence at and control of the Shorecrest, and his extensive contacts with employees, that he knew about, and approved, Hurdelbrink's actions.

■ In any event, Hurdelbrink was acting as Balistrieri's agent. Her duties as agent were to show apartments and to do the other things—such as quoting rents and stating rental conditions—that go along with that job. Hurdelbrink was acting within the scope of her authority—either actual or apparent—when she committed her discriminatory acts. As we have previously held, in housing discrimination cases, "a principal is liable for the wrongful acts of its agent." *Hamilton v. Svatik,* 779 F.2d 383, 388 (7th Cir.1985); see also *Coates v. Bechtel,* 811 F.2d 1045, 1051 (7th Cir.1987). Therefore, Balistrieri is liable for Hurdelbrink's discrimination, even if he never expressly approved it.

■ The defendants' final argument regarding liability is that the district court should have required the government to prove its case by clear and convincing evidence rather than by a preponderance of the evidence. The preponderance standard, however, is the normal standard in civil cases, and has been applied in pattern and practice discrimination cases in other contexts. See *Teamsters,* 431 U.S. at 336, 97 S.Ct. at 1855 (Title VII; plaintiff must prove "by a preponderance of the evidence that [the] discrimination was the company's standard operating procedure"); *King,* 960 F.2d at 623 (ADEA). The defendants have given us no convincing reason why that standard should not apply here.

### III.

■ The defendants also challenge the damage awards in this case. With regard to the testers, the defendants argue that there was insufficient evidence to show that they actually suffered any emotional distress as a result of the defendants' discrimination.

The evidence of emotional distress is not strong. All of the evidence of emotional distress came from the testers' own testimony. There was no corroboration from any source. Each of the testers testified generally about his or her being upset, humiliated, embarrassed or shamed. The substance of that testimony follows.

Davis testified that when she found out about the results of the tests she became angry and upset. The whole episode has made her "cautious and on edge," especially with white people. Her anger still existed at the time of trial because she believed "those kind of conditions still exist." However, she stated that her anger was not "extremely disabling."

Herbig also testified to being upset. She also felt nauseous, embarrassed, and ashamed that she had been treated differently. She still felt upset at the time of trial, and at times was physically upset and had lost sleep. She "generally [felt] bad, physically and emotionally."

Hubbard testified about his anger and frustration at the knowledge that he had been treated differently than a white person. He felt "hurt and disappointed." He also felt a "sense of helplessness and fear" that someday he would again be judged because of his race instead of his merits as a person. According to Hubbard, the defendants' discrimination made him "suspicious" about how he would be treated in the future and "wary" of going into situations in which he might be treated differently.

Sims–Daniels felt "disbelief and kind of a hurt feeling like feeling real sorry" upon finding out about the test results. She had a "gut feeling" in her stomach that wasn't comfortable. The episode had affected her relationship with her husband, children, and other family members because she would talk about her experience with those people. However, her feelings of disbelief or discomfort did not disable her or make her lose time from her job.

Thompson testified that when he found out the results of the test he was "surprised" and "didn't believe it." Those results "bother[ed] him" and made him less

trustful of people; his experience made him wonder "what are [people] really thinking?" He worries about how his children will be treated. Hubbard characterized his experience with the test as "one of the worst things" that's happened to him.

We have long held that emotional distress caused by housing discrimination is a compensable injury under the Fair Housing Act. See *Seaton v. Sky Realty Co.*, 491 F.2d 634, 636–38 (7th Cir. 1974). However, a court may not presume emotional distress from the fact of discrimination. A plaintiff must actually prove that he suffers from emotional distress and that the discrimination caused that distress. Cf. *Carey v. Piphus*, 435 U.S. 247, 263–64, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252 (1978) (holding in a procedural due process case that "neither the likelihood [of emotional distress] nor the difficulty of proving it is so great as to justify awarding compensatory damages without proof that such injury actually was caused"); *Spence v. Board of Education*, 806 F.2d 1198, 1200–01 (3d Cir.1986) (applying the same principle in a first amendment case).

The defendants argue that the testers' testimony was not sufficient to prove their emotional distress. They base their argument on *Biggs v. Village of Dupo*, 892 F.2d 1298 (7th Cir.1990) and *Nekolny v. Painter*, 653 F.2d 1164, 1172–73 (7th Cir.1981). In *Biggs*, the plaintiff was fired from his job as a police officer in retaliation for protected speech. He claimed that the firing caused him emotional distress, but the only evidence of that distress was his testimony that he was "affected emotionally" by his firing and that he "was concerned over 'the idea of my family going through it.'" 892 F.2d at 1304. Similarly, we held in *Nekolny* that "[a] single statement by a party that he was 'depressed,' 'a little despondent' or even 'completely humiliated' ... [was] not enough to establish injury" when considered along with the facts in that case. 653 F.2d at 1172–73.

*Biggs* and *Nekolny* stand for the principle that "'when the injured party provides the sole evidence, he must reason-

ably and sufficiently explain the circumstances of his injury and not resort to mere conclusory statements.'" *Biggs,* 892 F.2d at 1304 (quoting *Rakovich v. Wade,* 819 F.2d 1393, 1399 n. 6 (7th Cir.1987), *vacated on other grounds,* 850 F.2d 1180 (1988)). This is not to say, however, that an injured person's testimony can never be sufficient by itself, or in conjunction with the circumstances of the particular case, to establish damages for emotional distress. *Rakovich,* 819 F.2d at 1399 n. 6; *Crawford v. Garnier,* 719 F.2d 1317, 1324 (7th Cir. 1983). For instance, in *Seaton,* we upheld an award for emotional distress despite the fact that the only direct evidence of emotional distress was the plaintiff's testimony that "I was humiliated. I was intimidated, not only as a person but as a man. He stripped me of my right as a father to my kids." 491 F.2d at 636. This testimony is not qualitatively much different than that found insufficient in *Biggs* and *Nekolny.* But in *Nekolny,* we distinguished *Seaton* on the basis that "[t]he circumstances here do not approach the egregiousness of those found in *Seaton....*" 653 F.2d at 1173.

■■■ *Nekolny* teaches that in determining whether the evidence of emotional distress is sufficient to support an award of damages, we must look at both the direct evidence of emotional distress and the circumstances of the act that allegedly caused that distress. Cf. *Carey,* 435 U.S. at 263–64, 98 S.Ct. at 1052 ("Distress ... is customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff."). The more inherently degrading or humiliating the defendant's action is, the more reasonable it is to infer that a person would suffer humiliation or distress from that action; consequently, somewhat more conclusory evidence of emotional distress will be acceptable to support an award for emotional distress.

In housing discrimination cases, we have generally upheld awards for emotional distress despite the lack of detailed description of that distress. See, e.g., *Douglas v. Metro Rental Services, Inc.,* 827 F.2d 252, 256–57 (7th Cir.1987) (holding evidence similar to that in this case was insufficient to sustain a $10,000 award for emotional distress but sufficient to sustain a $2,500 award); *Crumble v. Blumthal,* 549 F.2d 462, 467 (7th Cir.1977) (remanding for consideration of emotional distress damages based on plaintiff's testimony that he was "humiliated and embarrassed" by the defendant's conduct); *Seaton,* 491 F.2d at 636–38. In *Seaton,* we seemed to suggest that racial discrimination, "which is one of the relics of slavery" is the type of action that one could reasonably expect to humiliate or cause emotional distress to a person. See 491 F.2d at 636.

However, the housing discrimination cases we have cited all involved plaintiffs who were actually seeking housing and deprived of that housing because of their race. Therefore, on top of the racial discrimination, those cases involved the inevitable disappointment and frustration involved in being unable to obtain housing. Our case, on the other hand, involves testers. Should that make a difference? Perhaps. As we noted in *Dwivedi,* as an original matter, "the idea that [a tester's] legal rights have been invaded seems an arch formalism." 895 F.2d at 1526. Testers are investigators; "they suffer no harm other than that they invite in order to make a case against the persons investigated...." *Id.* One could say that a person who suffers discrimination he himself invites to do a job he is paid or would generally be less likely to feel as humiliated by that discrimination than a bona fide home seeker who was doing nothing more than looking for a place to live. Therefore, one could reasonably conclude that a tester—as opposed to a bona fide home seeker—who claims damages for emotional distress should have to offer as proof of that distress more than the general, conclusory statements we have accepted in cases such as *Seaton.* In fact, a tester who helps expose discrimination could conceivably experience certain satisfaction in helping to correct wrongful conduct. Some testers could even be pleased with the success of their undercover operation.

Still, we hesitate to base a decision in a specific case on generalities. The jury is in the best position to evaluate both the humiliation inherent in the circumstances and the witness's explanation of his injury. Moreover, the jury is able to examine the witness personally; a jury may glean as much if not more about a witness's emotional state from the witness's demeanor than from his attempts to explain the nature of his injury in words. Given that deference to the jury, we think the testimony was sufficient in this case to support the jury's modest awards for emotional distress. Although the testers' testimony regarding emotional distress was somewhat general and conclusory (and strikingly consistent), it was more detailed than that found lacking in *Biggs* and *Nekolny*. The testers did suffer the indignity of being discriminated against because of their skin color. Although the evidence was minimal, it was sufficient.

The defendants also argue that we must reverse the award of damages to the testers because any emotional distress they suffered was not proximately caused by the defendants' actions. The testers did not know they had been discriminated against until Carla Wertheim, MMFHC's associate director, told them about the results of the tests. Only after this did any of the testers experience any anger, humiliation, or distress. According to the defendants, Wertheim's action broke the causal connection between the defendants' acts and the testers' injuries. Since Hurdelbrink apparently treated each tester decently and did not arouse any suspicion during the apartment inquiries and showings, defendants claim an intervening force actually caused the emotional distress.

We disagree. All Wertheim did was inform the testers about the true nature of the defendants' actions. As the government notes, discrimination is not always immediately apparent, and a victim must often see the full picture before he realizes he has been discriminated against. The fact that the victim does not suffer the full effects of the discrimination until he discovers the big picture does not change the fact that the defendant's discrimination was the primary cause of his harm.

The defendants also argue that we should reverse the award of damages to the testers because the district court did not give an instruction defining emotional distress. However, we believe the instructions given were adequate. The court told the jury that it could only award damages that were the "direct consequence" of the defendants' acts and that were the "direct result" of a Fair Housing Act violation, and that damages may include "emotional distress or mental anguish" caused by the defendants' conduct. Although these instructions did not define the terms "emotional distress" or "mental anguish," those terms are not so technical that they required definition.

The defendants also challenge the jury's award of $5,000 in damages to the MMFHC, claiming that there was insufficient evidence to support the award. In *Dwivedi*, we stated that the "deflection of the agency's time and money from counseling to legal efforts directed against discrimination" is a sufficient injury to confer standing to sue on a fair housing agency. 895 F.2d at 1526. It follows that if the agency is able to establish this injury at trial, it may collect for it. In this case, Wertheim's testimony established that the MMFHC's time and money was deflected to legal efforts—conducting tests at the Shorecrest, and following up on the results of those tests. Wertheim testified about the staff time spent on that effort and the cost of that effort, and explained her figures to the jury. Based on Wertheim's testimony, the jury could reasonably find that the MMFHC had suffered damages of at least $5,000.

## IV.

Balistrieri challenges the injunction entered against him on two grounds. First, he argues that the district court erred by placing the burden on him to prove that an injunction would not be necessary. But in *DiMucci*, we held that "the force of proof by the government that de-

fendants have engaged in a pattern or practice of discrimination carries over to the remedial phase of the proceeding." 879 F.2d at 1498. This creates a presumption that an injunction is appropriate; the defendant can rebut this presumption "by showing that such relief is not necessary because there is little or no danger of current violations." *Id.*

Balistrieri argues, however, that because the finding of pattern or practice was made by a jury, it cannot carry over to the injunction hearing, an equitable proceeding. According to Balistrieri, the judge must make a separate finding that there is a continuing pattern or practice of discrimination, and the government bears the burden of proving this. We disagree, based on an analogy to employment discrimination cases. Where a claim under Title VII—an equitable claim—and 42 U.S.C. § 1981—a legal claim—are tried simultaneously before a judge and jury, the jury's verdict binds the judge on all factual issues common to the two claims. *Hunter v. Allis–Chalmers Corp.*, 797 F.2d 1417, 1421 (7th Cir.1986). The same principle should apply here. In effect, the parties were trying simultaneously equitable and legal claims (the actions for damages and for an injunction) that had a common factual issue—the existence of a pattern of racial discrimination. The jury's verdict, brought in before the judge had made any factual findings on the matter, established that the defendants had engaged in a pattern of discrimination. That finding controlled. At that point, then, this case became like *DiMucci:* the government at the liability stage of trial had shown that a pattern of discrimination existed. Under *DiMucci*, this created a presumption that injunctive relief was necessary, and placed the burden on Balistrieri to rebut that presumption.

Balistrieri also challenges the propriety of the injunction on several other grounds. First, he argues there was no evidence of discrimination. As we have already noted, there was sufficient evidence for the jury to find that Hurdelbrink's actions constituted a pattern of discrimination and that Balistrieri knew about and approved Hurdelbrink's actions. Balistrieri also argues that the injunction was improper because there was no finding he acted willfully or maliciously. However, those findings were not necessary. To enter an injunction, the district court had to find that Balistrieri had not rebutted the presumption that an injunction was appropriate. This, in turn, meant that Balistrieri had to show that the discriminatory practices were not continuing. *DiMucci*, 879 F.2d at 1498–99. The evidence at the injunction hearing showed that rental practices at the Shorecrest had not changed since the first trial. Based on this evidence, the district court did not clearly error in finding that Balistrieri had not met his burden of proving that injunctive relief was not appropriate.

## V.

The government has cross-appealed the district court's decisions not to allow it to seek damages for Marva Pattillo and Kim Williams, and to direct a verdict for the defendants on the issue of punitive damages. We agree with the government that both these decisions were erroneous.

We turn first to the decision not to allow the government to seek damages for Pattillo and Williams. In its complaint, the government alleged generally that the defendants had engaged in a pattern or practice of discrimination. The complaint also stated generally that "[p]ersons who have been the victims of defendants' discriminatory practices are aggrieved persons as defined in 42 U.S.C. § 3602(i)," and asked the court to award damages to those aggrieved persons. The complaint did not, however, specifically name any aggrieved persons. Rather, the government revealed the names of those people during the course of discovery.

In responding to Balistrieri's first set of interrogatories on May 23, 1990, the government stated that it did not know when the alleged pattern or practice of discrimination began or ended, but that it had evidence of specific instances of discrimination in April, May, and June of 1989. The

government also identified the five black testers as aggrieved persons for whom the government sought damages. As discovery progressed, the government found that Pattillo was another person whom the defendants had allegedly discriminated against. In its Second Supplemental Response to Balistrieri's interrogatories, filed on July 27, the government disclosed Pattillo as an aggrieved person and described her contacts with the Shorecrest. Discovery progressed further, and the government found that Williams was another alleged victim of discrimination. On August 14, the government filed its Third Supplemental Response to Balistrieri's interrogatories, identifying Williams as an aggrieved person. The defendants deposed Williams the next day, the day on which discovery closed.

Trial was set for January 28, 1991. On December 21, 1990, the government filed its pretrial report, which mentioned Williams and Pattillo as aggrieved persons. A few days later, the defendants objected to the introduction of evidence of any events that happened after June 5, 1989, the date the last tester visited the Shorecrest. On the first day of trial, however, Balistrieri shifted the focus of his objection, arguing that the government should not be able to seek damages for any victim of discrimination it was not aware of at the time it filed its complaint; in other words, Balistrieri argued that the government should not be able to seek damages for anybody but the testers. The district court held that Pattillo could testify, since she was allegedly discriminated against before June 5; however, the government could not seek damages for her. Williams could not testify, and the government could not seek damages for her because she was allegedly discriminated against after June 5.

■ The basis for the court's decision is not clear. The court seems to have relied on three grounds: the government could not seek damages for aggrieved persons whom it did not know of when it filed its complaint; the government could not seek damages for people discriminated against after June 5; and, the defendants did not

receive timely notice that the government would be seeking damages for Williams and Pattillo. We do not think that any of these bases were sufficient to deny the government the opportunity to seek damages for Williams and Pattillo.

■ There was no reason to allow the government to seek damages only for aggrieved persons it knew about at the time it filed its complaint. Similarly, there was no reason to limit damages only to those allegedly discriminated against before June 5, 1989. The premise for both these conclusions seems to be that the pattern alleged lasted only until June 5, and included only discriminatory acts against the black testers. True, the complaint was filed in response to the tests. But nothing in the complaint supports the conclusion that the pattern or practice alleged was limited to those acts. The complaint did not limit the pattern to any particular dates, to any particular acts, or to acts against any particular people. The government's complaint notified the defendants of the claim against them; the government properly proceeded to flesh out that claim through the discovery process. The government's interrogatory responses did not limit the time period involved; in fact, the government indicated that it did not know the precise dates that the pattern or practice of discrimination began or ended. The Fair Housing Act allows courts to award damages to persons aggrieved by a defendant's pattern of discrimination; nothing in the act demands, or even implies, that damages are proper only for people the government knows about at the time it files its complaint. The term "pattern or practice" itself implies an ongoing series of acts; it would be asking next to the impossible to demand that the government know about every victim of that alleged pattern before filing a complaint.

■ This does not mean, as the government itself concedes, that the defendants were not entitled to sufficient notice of the people for whom the government sought damages. The question thus boils down to whether the defendants had adequate notice of Pattillo and Williams so

that they could defend against the government's attempt to seek damages for them. The district court's decision that the government provided inadequate notice of Williams and Pattillo is analogous to a decision whether to allow a party to amend a pleading. Generally, the decision whether to allow a plaintiff to amend his complaint is left to the district court's discretion. *Campbell v. Ingersoll Milling Machine Co.*, 893 F.2d 925, 927 (7th Cir.1990). It is appropriate to apply that abuse of discretion standard to the court's decision here.

We conclude that the court has abused its discretion. The court did not really explain why it would not allow damages for Williams and Pattillo. Since the evidence in this case was not overwhelming, the court may have decided to draw a time line. In any event, the record reveals no real reason for not allowing the government to seek damages for Williams and Pattillo. The complaint put the defendants on notice that it was seeking damages for all aggrieved persons it might discover. The government told the defendants about Williams and Pattillo as soon as it found out about them. This was not eleventh-hour notice. The government informed the defendants about Pattillo six months before trial, and about Williams more than five months before trial. The defendants were able to depose Williams; but even though they had ample time, they apparently chose not to depose Pattillo. There is no hint that the defendants were in any way prejudiced by the timing of the government's notice. Because there was no reason for denying damages for Pattillo and Williams, we must remand this case for a trial on that issue.

■■■■ We must also remand for a trial on punitive damages. The district court directed a verdict against the government on punitive damages because the court could find no evidence of willfulness or wantonness indicating the defendants' desire to hurt or injure. That decision was error. Punitive damages are appropriate in cases of "reckless or callous disregard for the plaintiff's rights, [or] intentional violations of federal law...." *Smith v.*

*Wade,* 461 U.S. 30, 51, 103 S.Ct. 1625, 1637, 75 L.Ed.2d 632 (1983); see also *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 266–67, 101 S.Ct. 2748, 2759, 69 L.Ed.2d 616 (1981) (punitive damages are appropriate where a wrongful act is "intentional or malicious"). This does not mean that the defendant had to know he was violating the law. As we stated in *McKinley v. Trattles,* 732 F.2d 1320, 1327 (7th Cir.1984), "[u]nder *Smith,* if the conduct upon which liability is founded evidences reckless or callous disregard for the plaintiff's rights or if the conduct springs from evil motive or intent, punitive damages are within the discretion of the jury."

■■■■ Here there was sufficient evidence for the jury to award punitive damages under this standard. The jury could reasonably find from the defendants' systematic practice of treating black apartment seekers less favorably than whites that the defendants consciously and intentionally discriminated against potential black renters. It is true that the jury was not required to award punitive damages, for punitive damages are always discretionary. But it was error for the district court to remove this decision from the jury in the face of evidence of intentional discrimination. The jury's discretionary moral judgment is "essentially unreviewable." *Id.* Therefore, we must remand for a new trial on the issue of punitive damages.

■■■■ The district court did impose civil penalties on the plaintiffs. Civil penalties and punitive damages serve a common purpose: to punish wrongdoing. See *Tull v. United States,* 481 U.S. 412, 422 n. 7, 107 S.Ct. 1831, 1838 n. 7, 95 L.Ed.2d 365 (1987). However, the award of civil penalties does not make up for the mistake of directing a verdict on punitive damages because while similar, the two are not identical. Punitive damages are paid to the plaintiffs; civil penalties are paid to the United States. But the district court may take the jury's award of punitive damages into account in making its discretionary decision whether to award civil penalties. See 42 U.S.C. § 3614(d)(1)(C) (court "may" award civil penalties). Because an award of punitive

damages may affect the court's decision whether to impose civil penalties, we vacate the award of civil penalties to allow the district court to reconsider its decision regarding civil penalties on remand.

For the reasons set forth above, the district court's decision regarding liability and compensatory damages for the testers is affirmed. The court's decisions regarding damages for Pattillo and Williams, and regarding punitive damages are reversed. The award of civil penalties is vacated. We remand the case for further proceedings consistent with this opinion. Circuit Rule 36 shall not apply on remand.